GROUP HEALTH INSURANCE OF NEW JERSEY, A NEW JERSEY CORPORATION, APPELLANT, v. CHARLES R. HOWELL, COMMISSIONER, DEPARTMENT OF BANKING AND INSURANCE, STATE OF NEW JERSEY, AND ARTHUR J. SILLS, ATTORNEY GENERAL OF THE STATE OF NEW JERSEY, RESPONDENTS, AND MEDI-CAL-SURGICAL PLAN OF NEW JERSEY (NEW JERSEY BLUE SHIELD PLAN), A NEW JERSEY CORPORATION, AND THE MEDICAL SOCIETY OF NEW JERSEY, A NEW JERSEY CORPORATION, ADDITIONAL RESPONDENTS.

Argued June 4, 1963—Decided July 1, 1963.

438

*Mr. Irving Abramson,* of the New York Bar, argued the cause for the appellant, Group Health Insurance of New Jersey (*Messrs. Kapelsohn, Lerner, Leuchter & Reitman,* attorneys; *Mr. Donald Grody,* of the New York Bar, on the brief).

*Mr. Steven S. Radin,* Deputy Attorney General, argued the cause for the respondents, Charles R. Howell, Commissioner, Department of Banking and Insurance, and Arthur J. Sills, Attorney General of the State of New Jersey (*Mr. Arthur J. Sills,* Attorney General of New Jersey, attorney; *Mr. Irwin R. Rein,* on the brief).

*Mr. William R. Vanderbilt* argued the cause for the additional respondent, Medical-Surgical Plan of New Jersey (New Jersey Blue Shield Plan) (*Messrs. Toner, Crowley, Woelper & Vanderbilt,* attorneys).

*Mr. Robert M. Backes* argued the cause for the additional respondent, The Medical Society of New Jersey (*Messrs. Backes & Backes,* attorneys).

*Mr. Leonard Rosenstein* filed a brief *amicus curiae* on behalf of Group Health Association of America, Inc. (*Messrs. Hansen, Hazen & Lynch,* of the Minnesota Bar, of counsel; *Mr. Horace R. Hansen,* of the Minnesota Bar, on the brief).

The opinion of the court was delivered by

PROCTOR, J. This appeal involves the constitutionality of N. J. S. A. 17:48A-2 and N. J. S. A. 17:48A-3 of the Medical Service Corporations Law (*L.* 1940, *c.* 74, as amended, *N. J. S. A.* 17:48A-1 *et seq.*).

The appellant, Group Health Insurance of New Jersey (GHI), a New Jersey corporation, applied to the respondent Commissioner of Banking and Insurance (Commissioner) for a certificate of authority to transact business as a medical service corporation under the Medical Service Corporations

Law, *supra*. After a meeting and an exchange of correspondence with the Commissioner, GHI indicated its ability and willingness to comply with all requirements of the Law except for sections 2 and 3 (*N. J. S. A.* 17:48A-2, 3), contending that those sections were unconstitutional. The Commissioner informed GHI by letter of his determination that under the Law compliance by an applicant with sections 2 and 3 was mandatory before a certificate of authority could be issued, and therefore the application of GHI could not be entertained without such compliance.

Thereafter, GHI brought an action in the Law Division seeking a judgment declaring that sections 2 and 3 of the Law are unconstitutional and that GHI need not comply with them. The complaint named the Commissioner and the Attorney General as defendants. After those defendants answered, denying the allegations of unconstitutionality of sections 2 and 3, GHI moved for summary judgment. Supporting the motion were affidavits of three officers and trustees of GHI and several exhibits attached thereto, showing GHI's unsuccessful attempt to secure the cooperation of The Medical Society of New Jersey (Medical Society) in obtaining a certificate of authority to transact business as a medical service corporation. Prior to the return date of the motion for summary judgment, the trial court granted the above-named defendants' motion to join as additional defendants the Medical-Surgical Plan of New Jersey (Blue Shield) and the Medical Society, because of their interest in the subject matter of the proceedings. Amended complaints were served on the additional defendants and their answers also denied the allegations of unconstitutionality of sections 2 and 3. Thereafter, on motion of the Attorney General, the trial court ordered the cause transferred to the Appellate Division pursuant to *R. R.* 1:27D(a), because it was satisfied that "the plaintiff [GHI] seeks a review of a final decision or action of a State administrative agency." See *R. R.* 4:88-8. The record of the proceedings before the Commissioner, including the exchange of letters between counsel for GHI and the Commissioner, was

certified and filed in the Appellate Division. Before argument in that court, we certified the matter on our own motion.

■ None of the parties questions the propriety of the procedure followed below, and as the only issues concern the constitutionality of *N. J. S. A.* 17:48A–2 and 3, we will consider the matter as an appeal under *R. R.* 4:88–8 from the final action of the Commissioner in refusing to entertain GHI's application for a certificate of authority to transact business as a medical service corporation. *Cf. Carls v. Civil Service Commission of N. J.,* 17 *N. J.* 215 (1955).

The Medical Service Corporations Law was enacted under the sponsorship of the Medical Society in 1940. It was amended in 1944 and 1953 in matters not here pertinent. Under the Law, a medical service corporation is any nonprofit corporation organized without capital stock for the purpose of establishing, maintaining and operating nonprofit medical service plans, or to provide or pay for medical services on the basis of premiums. A nonprofit medical service plan is any plan or arrangement operated by such a corporation under the provisions of the Law whereby the expense of medical services to subscribers and covered dependents is paid in whole or in part by such corporation to participating physicians of such plans or arrangements and to others as provided in the Law. A subscriber is one to whom a subscription certificate is issued by the corporation which sets forth the kinds and extent of the medical services for which the corporation is liable to make payment. A participating physician is any physician licensed to practice medicine and surgery in New Jersey, who agrees in writing with the corporation to perform the medical services specified in the subscription certificates issued by the corporation, at such rates of compensation as shall be determined by its board of trustees, and who agrees to abide by the corporation's rules. Medical service includes all general and special medical and surgical services ordinarily provided by such licensed physicians in accordance with accepted practices in the community. No subscriber or his covered dependents shall be liable for any payment to any participating phy-

sician for medical services specified in the subscriber's certificate to be paid to the participating physician by the corporation. *N. J. S. A.* 17:48A–1. The corporation may classify subscribers whereby under specified circumstances a subscriber or covered dependent may pay a participating physician for medical services an amount in addition to that payable by the corporation, if the subscription certificate contains the provisions thereof and specifies the circumstances. No medical service corporation may transact business unless it first secures a certificate of authority to do so from the Commissioner, who must be satisfied that the corporation has complied with all provisions of the Law. *N. J. S. A.* 17:48A–3.

The Commissioner is given broad powers under the Law to supervise a medical service corporation so that its "condition or methods of operation are not such as would render its operations hazardous to the public or its subscribers." *N. J. S. A.* 17:48A–3. The form of all subscription certificates must be filed with the Commissioner, who may at any time disapprove any such form as being "contrary to law, or as being oppressive or calculated to mislead the public," and the corporation may not thereafter issue any form so disapproved. *N. J. S. A.* 17:48A–9. Similarly, a full schedule of rates to be paid by subscribers must be filed with the Commissioner, who may at any time disapprove the rates "if he finds that such rates are excessive, inadequate or discriminatory." *N. J. S. A.* 17:48A–10. Annual financial reports must be filed with the Commissioner by the corporation, and the Commissioner may inquire into and investigate any matter connected with the corporation's affairs. *N. J. S. A.* 17:48A–15 to 19. Whenever the Commissioner shall ascertain as a result of examination or otherwise that any medical service corporation "is exceeding its powers or violating the law or that its condition or methods of business are such as to render the continuance of its operations hazardous to the public or its members, that its assets are less than its liabilities or that the number of subscribers to its service has decreased to less than one hundred persons, or that it has failed to maintain the

number of participating physicians specified by this act, said commissioner may institute an action in the Superior Court to enjoin it from the transaction of any further business, or from the transfer or disposal of its property in any manner whatsoever." *N. J. S. A.* 17:48A–20.

The Law specifically limits the percentage of payments received from subscribers which may be disbursed for the solicitation of subscribers and for administrative expenses, *N. J. S. A.* 17:48A–12, 13, and requires that the corporation's funds may be invested only in accordance with the requirements for the investment of funds of life insurance companies. *N. J. S. A.* 17:48A–14.

At the present time, the only medical service corporation authorized to transact business in New Jersey is the Medical-Surgical Plan of New Jersey, commonly called Blue Shield, which was organized in 1942. As stated in the brief of the Medical Society, the Society "subscribed and initiated the creation in 1942 of the Medical-Surgical Plan of New Jersey (Blue Shield)," and "it remains today * * * as the one medical service plan in our State. * * * [A]lthough M. S. P. is completely autonomous, it does enjoy with The Medical Society the benefits of four interlocking board members currently; The Medical Society president does sit ex-officio as a member of M. S. P.'s Board of Trustees; there is an advisory committee to review M. S. P. disputed claims which is a Medical Society committee whose purpose is to achieve understanding and acceptance by subscribers and physicians in claim disputes; it does seek advice of the Society in its problems of common interest; the Society does approve the nominees to the M. S. P. board prior to their election * * *." The brief further states: "Through the year 1961 M. S. P. had enrolled 2,176,679 subscribers, and under contract had 6,564 participating physicians, or 81% of all the physicians in the State licensed to practice medicine and surgery."

GHI has been organized pursuant to *N. J. S. A.* 15:1–1 *et seq.* as a nonprofit corporation without capital stock and

has its principal office in Paterson. It is governed by a board of twelve trustees. GHI proposes to offer a medical service plan similar to that of Blue Shield, in that both undertake to pay a participating physician in full (according to the schedule of fees which each participating physician agrees to accept as payment in full for covered services) for enumerated medical and surgical services rendered to a subscriber or his covered dependents, or to indemnify the subscriber to the extent of the schedule of fees where the services are rendered by a non-participating physician. However, under the Blue Shield plan, a participating physician retains the right to charge a subscriber an additional amount for his fee if the subscriber earns over $5,000 per year, or if under a family contract, the yearly income of the subscriber together with that of the subscriber's spouse (if enrolled) is more than $7,500. The plan proposed by GHI, according to its certificate of incorporation, contains no such income limitations. Under it, a participating physician would agree to accept the scheduled fees as payment in full for the enumerated medical and surgical services rendered to a subscriber or his covered dependents, regardless of the amount of the subscriber's yearly income. Moreover, the record indicates that the proposed plan of GHI provides a wider range of service benefits than what is presently offered by Blue Shield. There is no indication in the record, however, as to how the subscriber premium rates for the proposed GHI plan would compare to the rates now charged by Blue Shield to its subscribers.

The pertinent part of section 2 of the Medical Service Corporation Law, the validity of which GHI challenges, reads as follows:

"No person shall be elected a trustee of any medical service corporation unless his nomination has been approved by a recognized medical society or professional medical organization having not less than two thousand members holding licenses to practice medicine and surgery pursuant to chapter nine, Title 45 of the Revised Statutes, and which has been incorporated for a period of not less than ten years."

[2] It is undisputed that the Medical Society, a private corporation, is the only organization in the State which meets the above statutory requirements. Under the Law, therefore, no corporation can secure a certificate of authority to transact business as a medical service corporation without first obtaining the Medical Society's approval of the corporation's trustees prior to their election. We think such a power to determine who shall have the right to engage in an otherwise lawful enterprise may not validly be delegated by the Legislature to a private body which, unlike a public official, is not subject to public accountability, at least where the exercise of such power is not accompanied by adequate legislative standards or safeguards whereby an applicant may be protected against arbitrary or self-motivated action on the part of such private body. See *Fink v. Cole*, 302 *N. Y.* 216, 97 *N. E. 2d* 873 (*Ct. App.* 1951); *Union Trust Co. v. Simmons*, 116 *Utah* 422, 211 *P. 2d* 190 (1949); 1 Davis, *Administrative Law*, §§ 2.14, 2.15 (1958); Jaffe, "Law Making by Private Groups," 51 *Harv. L. Rev.* 201, 233 (1937); Note, 67 *Harv. L. Rev.* 1398 (1954).

In *Fink v. Cole, supra,* a New York statute required all jockeys, trainers and owners of race horses to obtain a license from The Jockey Club, a private corporation. The Court of Appeals held that the statute constituted an unlawful delegation of legislative power, saying:

"In our view the delegation by the Legislature of its licensing power to The Jockey Club, a private corporation, is such an abdication as to be patently an unconstitutional relinquishment of legislative power in violation of section 1 of article III of the Constitution of this State which provides: 'The legislative power of this State shall be vested in the Senate and Assembly.' See *Fox v. Mohawk & Hudson Riv. Humane Soc.,* 25 *App. Div.* 26, 33, 48 *N. Y. S.* 625, 629, affirmed 165 *N. Y.* 517, 524, 528, 59 *N. E.* 353, 356, 51 *L. R. A.* 681; *Carter v. Carter Coal Co., supra,* 298 *U. S.* 238, at *page* 311, 56 *S. Ct.* 855, àt *page* 872, 80 *L. Ed.* 1160; *Schechter Poultry Corp. v. United States,* 295 *U. S.* 495, 537, 55 *S. Ct.* 837, 79 *L. Ed.* 1570; *Rouse v. Thompson,* 228 *Ill.* 522, 536, 81 *N. E.* 1109; *State v. Crawford,* 104 *Kan.* 141, 143, 177 *P.* 360, 2 *A. L. R.* 880; *Baughn v. Gorrell & Riley,* 311 *Ky.* 537, 224 *S. W. 2d* 436; *Wagner v.*

*City of Milwaukee*, 177 *Wis.* 410, 418, 188 *N. W.* 487." 302 *N. Y.*, at *p.* 225, 97 *N. E.* 2d, at *p.* 876.

The court also held the delegation invalid on the alternate ground that no standards were provided in the statute to guide the exercise of such licensing power, saying:

"Even if the Legislature's power to license had been delegated to a governmental agency, the statute now challenged would have to be stricken down for lack of guides and proper standards. *Packer Collegiate Inst. v. University of State of N. Y.*, 298 *N. Y.* 184, 191–192, 81 *N. E.* 2d 80, 83; *Matter of Small v. Moss*, 279 *N. Y.* 288, 299, 18 *N. E.* 2d 281, 285." 302 *N. Y.*, at *p.* 225, 97 *N. E.* 2d, at *p.* 876.

In *Union Trust Co. v. Simmons, supra,* a Utah statute prohibited the opening of branch banks in any municipality under a certain size without the consent of the banks already there. The Supreme Court held such a requirement to be an unconstitutional delegation of legislative authority. It said:

"In short, the bank commissioner is powerless under the statute with relation to cities other than those of the first class unless the potential competitor banks give their consent, regardless of the question of public convenience and advantage. Thus, the operation of the law is not contingent primarily upon the determination of public convenience and advantage by proper administrative authority, but is primarily contingent upon the whim and caprice of competitors whose interests obviously are opposed to additional competition." 116 *Utah*, at *p.* 427, 211 *P.* 2d, at *p.* 192.

The principles set forth in the above cases apply with equal vigor to the present case. Regardless of the qualifications of other medical service corporations, and of the desirability of having medical service plans offered to the public which may provide services not presently available, the Commissioner is powerless under section 2 of the Law to issue a certificate of authority to any corporation unless the Medical Society approves the corporation's trustees. In effect, therefore, the Medical Society, in passing upon the suitability of prospective trustees, performs what is essentially a licensing

function, since its approval is a necessary step toward the issuance of a certificate of authority. We think that such a power to restrict, or indeed, to prohibit, competition in a field so vitally connected with the public welfare may not constitutionally be placed in the hands of a private organization such as the Medical Society, which has an interest in promoting the welfare of the only existing medical service corporation in this State. See *Union Trust Co. v. Simmons, supra.* Such delegation by the Legislature of its licensing power violates *N. J. Const.* 1947, *Art.* IV, § 1, *par.* 1, which provides: "The legislative power shall be vested in a Senate and General Assembly." See *Fink v. Cole, supra,* 302 *N. Y.,* at *p.* 225, 97 *N. E. 2d,* at *p.* 876.[1]

Moreover, the statute sets forth no standards or safeguards to protect against unfairness, arbitrariness or favoritism, and is therefore void for lack of due process. See *Abelson's, Inc., v. N. J. State Board of Optometrists,* 5 *N. J.* 412, 424 (1950); *Fink v. Cole, supra.* See also 1 Davis, *supra,* at *p.* 148. This deficiency is especially crucial where, as here, the Medical Society's self-interest might tend to color its determination whether to approve the trustees of an applicant which may become a competitor of Blue Shield. See *Union Trust Co. v. Simmons, supra.*

The respondents rely on the following cases wherein a delegation of power to private persons or groups was upheld: *Driscoll v. Sakin,* 121 *N. J. L.* 225 *(Sup. Ct.* 1938), affirmed 122 *N. J. L.* 414 *(E. & A.* 1939); *Ross v. Freeholders of Essex,* 69 *N. J. L.* 291 *(E. & A.* 1903); *State v. Biehl,* 135 *N. J. L.* 268 *(Sup. Ct.* 1947); *Floyd v. Thornton,* 220 *S. C.*

---

[1] In view of our holding, we need not pass upon the serious question whether section 2 of the Law (*N. J. S. A.* 17:48A–2) constitutes, in effect, a legislative appointment of administrative officers (a "medical society or professional medical organization") in violation of *N. J. Const.* 1947, *Art.* IV, § 5, *par.* 5, which reads: "Neither the Legislature nor either house thereof shall elect or appoint any executive, administrative or judicial officer except the State Auditor." *Cf. Richman v. Ligham,* 22 *N. J.* 40 (1956).

414, 68 *S. E. 2d* 334 (*Sup. Ct.* 1951); *Lanza v. Wagner,* 11 *N. Y. 2d* 317, 229 *N. Y. S. 2d* 380, 183 *N. E. 2d* 670 (*Ct. App.* 1962); *Sunshine Anthracite Coal Co. v. Adkins,* 310 *U. S.* 381, 60 *S. Ct.* 907, 84 *L. Ed.* 1263 (1939); *R. H. Johnson & Co. v. Securities and Exchange Com'n,* 198 *F. 2d* 690 (2 *Cir.* 1952), cert. denied 344 *U. S.* 855, 73 *S. Ct.* 94, 97 *L. Ed.* 664 (1952); *People v. Griswold,* 213 *N. Y.* 92, 106 *N. E.* 929 (*Ct. App.* 1914); *General Electric Co. v. Packard-Bamberger Co.,* 14 *N. J.* 209 (1953); *Lionel Corp. v. Grayson-Robinson Stores,* 15 *N. J.* 191 (1954). These cases are readily distinguishable from the present situation.

The cases of *Driscoll, Ross, Biehl, Floyd,* and *Lanza* all had to do with delegations of power to make appointments to or nominate candidates for public office. As recognized in *Floyd,* 220 *S. C.,* at *p.* 421, 68 *S. E. 2d,* at *p.* 337, a delegation of the power to make appointments to public office does not constitute an illegal delegation of legislative power, since the power of appointment to office is not legislative. Indeed, the court in *Lanza* expressly distinguished *Fink v. Cole, supra,* on the ground that *Fink* dealt with an improper delegation of legislative licensing power, whereas *Lanza* dealt with a proper delegation of the power of appointment to public office, which it did not consider a function of "such essentially legislative character as to fall afoul of the constitutional proscription." 11 *N. Y. 2d,* at *p.* 333, 229 *N. Y. S. 2d,* at *pp.* 392–393, 183 *N. E. 2d,* at *p.* 679. See 42 *Am. Jur., Public Officers,* § 95, *pp.* 953–954 (1942).

In both *Sunshine Anthracite Coal Co.* and *R. H. Johnson & Co.,* it was held that the private organizations there involved functioned subordinately to and under such close supervision and control of an administrative agency that no unconstitutional delegation of legislative power had been made to the private organizations. In *Sunshine,* the price-fixing features of the Bituminous Coal Act of 1937 (15 *U. S. C. A.* 828 *et seq.*) were under attack as an unlawful delegation of legislative power to private persons. In rejecting this challenge, the court said:

"Nor has Congress delegated its legislative authority to the industry. The members of the code function subordinately to the Commission. It, not the code authorities, determines the prices. And it has authority and surveillance over the activities of these authorities. Since law-making is not entrusted to the industry, this statutory scheme is unquestionably valid." 310 *U. S.*, at *p.* 399, 60 *S. Ct.*, at *p.* 915, 84 *L. Ed.*, at *p.* 1274.

In *R. H. Johnson & Co.*, the Securities Exchange Act of 1934 (15 *U. S. C. A.* 78a *et seq.*) granted to a registered securities association the power of taking initial disciplinary action against offending members. The National Association of Securities Dealers was such an association. The plaintiff attacked the act as unconstitutionally delegating legislative power to the National Association. The court rejected this argument, saying:

"In the light of the statutory provisions concerning (a) the [Securities and Exchange] Commission's power, according to reasonably fixed statutory standards, to approve or disapprove of the association's Rules, and (b) the Commission's review of any disciplinary action, we see no merit in the contention that the Act unconstitutionally delegates power to the association." 198 *F. 2d*, at *p.* 695.

In *Griswold*, a New York statute provided that an applicant for a license to practice dentistry who had previously been granted a license by a board of dental examiners of another state could receive a New York license without further examination as to his qualifications, if the other state's board of dental examiners had been endorsed by the New York state dental society. The power of the dental society, however, was limited to a determination whether the standards of preliminary and professional education exacted by the board of dental examiners of such other state as a prerequisite for the issuance of a license were equivalent to those required in New York. The duty so conferred of determining the licensing standards of other states was thus, in effect, only for the purpose of fulfilling a fact-finding function and did not amount to a grant of discretionary authority to determine which individuals should be prevented from securing a license to practice dentistry. *Cf.* Jaffe, *supra,* 51 *Harv. L. Rev.*, at *p.* 233.

Both *General Electric Co.* and *Lionel Corp.* concerned the validity of the "nonsigner" clause of the Fair Trade Act, *N. J. S. A.* 56:4–3 *et seq.* The act was upheld on the ground that the power thereby given to a manufacturer to enter into a price agreement with one retailer which would bind all other retailers was merely to permit the manufacturer to protect the value of his trademark and goodwill, in which he has a recognized property interest. Hence, there was no unlawful delegation of legislative power. See *Johnson & Johnson v. Weissbard*, 121 *N. J. Eq.* 585 (*E. & A.* 1937).

█ Nor do we think the cases cited by the respondents support their contention that adequate standards may be inferred from the Medical Service Corporations Law as a whole. Representative of the cases cited is *In re Berardi*, 23 *N. J.* 485 (1957). There, as in the others, the court found that the statute under review, when viewed as a whole in the light of its surroundings and objectives, set forth adequate standards to guide official administrative action. In the present case, no semblance of a standard to guide the Medical Society in its determination whether to approve prospective trustees may be found in any provision of the Law, nor does the Law when viewed as a whole in the light of its surroundings and objectives make up for this deficiency. See *Abelson's, Inc., v. N. J. State Board of Optometrists, supra*, at *p.* 424; *Fink v. Cole, supra*.

GHI next challenges the constitutionality of part of section 3 of the Law (*N. J. S. A.* 17:48A–3), which part provides:

"The certificate of authority issued by the commissioner shall specify the county or counties in which the corporation may conduct its business. Such certificate may be amended from time to time to include additional counties on the basis of qualification pursuant to the provisions of this act. No such certificate shall be issued to authorize a corporation to transact business in any *county, or if* issued, the authority with respect to such county shall be canceled by the commissioner, if he shall find that less than fifty-one per centum (51%) of the eligible physicians in any county are participating physicians."

█ The first argument raised by GHI is that the above-quoted section, by imposing a restriction on medical service corporations which is not imposed on stock and mutual health and accident insurance companies organized under the General Insurance Laws, *N. J. S. A.* 17:17–1 *et seq.*, deprives GHI of equal protection of the laws. However, GHI concedes that there are "distinctions between medical service corporations and health and accident insurers," and that "a different legislative scheme may be formulated to regulate medical service corporations where a rational distinction exists and a valid legislative purpose is subserved." The basic distinction between medical service corporations and ordinary health and accident insurers is that the former undertake to provide prepaid medical services through participating physicians, thus relieving subscribers of any further financial burden, while the latter only undertake to indemnify an insured for medical expenses up to, but not beyond, the schedule of rates contained in the policy. The ordinary health and accident insurer makes no attempt to provide medical services as such. The primary purpose of a medical service corporation, however, is an undertaking to provide physicians who will render services to subscribers on a prepaid basis. Hence, if there are no physicians participating in the medical service corporation's plan, not only will the subscribers be deprived of the protection which they might reasonably have expected would be provided, but the corporation will, in effect, be doing business solely as a health and accident indemnity insurer without having qualified as such and rendering itself subject to the more stringent financial requirements of the General Insurance Laws, *N. J. S. A.* 17:17–1 *et seq.* Compare *N. J. S. A.* 17:48A–4 with *N. J. S. A.* 17:17–6 and 7. Therefore, in recognition of this basic distinction between medical service corporations and ordinary health and accident insurers, the Legislature might properly impose restrictions on medical service corporations in order to make sure that some participating physicians would be available to potential subscribers, which restrictions would be unnecessary to impose on ordinary health

and accident insurers. See *Capitol Mutual Benefit Assn. v. State,* 119 *N. J. L.* 193 (*Sup. Ct.* 1937), and cases cited therein. Thus, GHI's contention resolves itself into an attack on the permissibility of the legislative objective and on the reasonableness of the restriction imposed in relation to such objective.

The restriction contained in section 3, quoted above, is imposed as a condition to the right of a medical service corporation to "transact business" in a county. Although "transact business" is not expressly defined in the Law, the requirement of a certificate of authority is first mentioned in section 2, wherein it is provided that no medical service corporation shall "solicit subscribers or enter into any contract with any subscriber" until it has received a certificate of authority to do so from the Commissioner. Hence, in requiring a certificate of authority to "transact business" on a county-by-county basis, the Legislature apparently equated that expression with the more descriptive phrase contained in section 2. As a condition to the issuance of a certificate of authority to "solicit subscribers or enter into any contract with any subscriber" in a county, therefore, section 3 requires that a medical service corporation must first have entered into participation agreements with at least 51% of the eligible physicians in that county. The question presented may be broadly stated thus: whether this requirement is reasonably related to any permissible objective of the police power.

In *Illinois Hospital Service, Inc. v. Gerber,* 18 *Ill.* 2d 531, 165 *N. E.* 2d 279 (*Sup. Ct.* 1960), the constitutionality of section 14 of the Non-Profit Hospital Service Plan Act (*Ill. Rev. Stat.* 1959, *chap.* 32, *par.* 562(b)) was challenged. The act provided for the establishment of hospital service corporations which would offer prepaid hospital service coverage under a plan similar in operation to a medical service plan under our Law. Under the Illinois act, a hospital service corporation may enter into participation contracts with hospitals, which would agree to provide hospital services to subscribers and to bill the corporation according to a schedule of

rates. Section 14 of the act provided that no corporation organized under the act "shall solicit, or issue a contract to, any subscriber in any County of this State unless there are at the time in full force and effect contracts * * * between said corporation and hospitals which operate not less than thirty per cent (30%) of the total number of general hospital beds which normally serve the residents of said County." The Supreme Court of Illinois struck down this section as being in violation of the due process clause of the Illinois constitution. Justice Schaefer, speaking for a unanimous court, said:

"Section 14 places control over the economic life of hospital service plans in the hands of the hospitals. The statute does not suggest and *the record does not show that any public purpose is served* by placing this power over hospital service plans—and over those who desire to subscribe to them—in private hands. By means of annual reports and his powers of visitation and examination, the Director [of Insurance] is required to supervise the financial stability of a hospital-service-plan corporation; its funds may be invested only in securities eligible for investment by life insurance companies. Costs incurred in the solicitation of subscribers are subject to the approval of the Director, as are the rates charged by the corporation to its subscribers and the rates of payment from the corporation to hospitals. (*Ill. Rev. Stat.* 1959, *chap.* 32, *pars.* 556, 557, 558, 559, 555.) In view of this comprehensive plan of governmental regulation, *we see no proper purpose to be served* by the private controls that are authorized by section 14." (Emphasis added)

We think the requirement of section 14 of the Illinois law is substantially the same in principle as the requirement of section 3 of our Medical Service Corporations Law, and in view of the similarity between the broad supervisory powers lodged in each of the respective states' administrative officials (in Illinois, the Director of Insurance; in New Jersey, the Commissioner of Banking and Insurance), the holding of the Supreme Court of Illinois in the above case is persuasive authority against the validity of our Law. We observe, however, that the opinion of the Illinois court noted the record there did not show that any public purpose was served by requiring a certain percentage of hospitals to be partici-

pants in the plan. In the present case, the Attorney General (joined by the other respondents) contends that the legislative purpose underlying the requirement of 51% of the physicians on a county-by-county basis is that "the Legislature in its discretion has made certain that subscribers and their dependents will have an adequate number of participating physicians available for selection within a reasonable geographical area"; and that county lines are proper delineations of a reasonable geographical area for this purpose.

On the other hand, GHI contends that there is "no valid insurance or medical purpose served by requiring a fifty-one percent participation," and although it recognizes that "particular 'area' limitations might be constitutionally acceptable in the context of a statute differently drawn," it argues that "the county line restriction is unrelated to the legislative scheme" contained in the Medical Service Corporations Law. ——[8]- On the record before us, we cannot say the requirement that 51% of the eligible physicians in a county be participants before a medical service corporation may transact business in that county is reasonably related to the concept that subscribers be assured of an adequate choice of participating physicians in the area in which they are most likely to seek medical attention. In view of the importance of the question presented here, and in the light of *Illinois Hospital Service, Inc. v. Gerber, supra,* which was not cited in any of the briefs nor discussed at oral argument, we think that the question should not be decided without a more fully developed record. To that end, the matter is remanded to the Commissioner so that the parties may have an opportunity to augment the record with evidence with respect to the reasonableness of the requirement of section 3 in relation to the afore-mentioned legislative purpose. In addition, we wish to hear further argument on the question whether, in light of the *Illinois Hospital* case, a requirement that a medical service corporation must secure the participation of *any* percentage of physicians as a condition to the issuance of a certificate of authority to transact business is valid. If

some percentage may validly be required, perhaps evidence would aid us in determining whether the county, as against some other concept of an area, is rationally related to the statutory scheme. We would also like to hear argument on the question whether section 2, and also section 3 if it should ultimately be held unconstitutional, are severable from the balance of the Medical Service Corporations Law. Although a saving clause, such as section 25 of the Law (*N. J. S. A.* 17:48A–25), is frequently dispositive of the question of severability, there may be circumstances which compel a court to conclude that the Legislature would not have enacted the statute without the inclusion of the objectionable part. Hence, a finding of unconstitutionality of such part may require that the entire statute be struck down, notwithstanding the saving clause. See *State by McLean v. Lanza,* 27 *N. J.* 516, 527–528 (1958) ; 2 *Sutherland, Statutory Construction,* § 2408, *p.* 182 (*3d ed.* 1943). And in this connection, if the challenged provisions were deleted, evidence may perhaps be available as to whether the Commissioner could nonetheless achieve the public aim within the framework of the statute under his general regulatory powers.

Moreover, there appear to be further questions involved in the requirement that 51% of the "eligible physicians in any county" must be participating physicians before a medical service corporation may transact business. Under sections 1 and 8 (*N. J. S. A.* 17:48A–1, 8), an eligible physician would appear to be any person licensed to practice medicine and surgery in this State. Does this group include a substantial number of physicians who are not engaged in the active private practice of medicine, *e. g.,* retired physicians, those in public service or employed by private corporations, or those engaged solely in research, and thus would not in any event be available to render covered medical services to subscribers? If so, does that make the 51% requirement arbitrary? Also, the 51% is to be calculated on the basis of the total number of physicians "in any county," but that term is nowhere defined in the statute. At this point, we find it difficult to

determine which physicians are "in" a county. A license to practice medicine and surgery in this State does not restrict the holder thereof to practicing in any particular county, although the holder must file his license or a certified copy thereof with the clerk of the county in which he resides. *N. J. S. A.* 45:9–17. Hence, several questions come to mind, *e. g.*, does the statutory term "in any county" include those physicians who reside in the county, but conduct their practices elsewhere?; does it include those who conduct their practice in the county, but reside elsewhere?; and does it include physicians who both reside and conduct their practices elsewhere, but who occasionally render medical services in hospitals or other places situated in the county? Although we recognize that these and similar questions regarding the meaning of the term "in any county" are questions of law, the matter was not adequately discussed in the briefs submitted to us. In these circumstances, and because the definition of "in any county" may be crucial to the validity of section 3, we think further briefs and argument on this point are warranted.

We hold that the quoted part of section 2 of the Medical Service Corporations Law (*N. J. S. A.* 17:48A–2) is unconstitutional for the reasons expressed above. The matter concerning the constitutionality of section 3 (*N. J. S. A.* 17:48A–3) is remanded to the Commissioner of Banking and Insurance for further proceedings consistent with this opinion. We shall retain jurisdiction of this appeal and the Commissioner is directed to file with this court the record of the proceedings before him on the remand. The interested parties will submit additional briefs and the matter will then be set down for reargument.

JACOBS, J., concurs in result.

*For reversal and remandment*—Chief Justice WEINTRAUB, and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANEMAN—7.

*For affirmance*—None.