128 N.J. Super. 472 (1974)
320 A.2d 504
NEW JERSEY ASSOCIATION OF INDEPENDENT INSURANCE AGENTS, A NEW JERSEY CORPORATION, C.W. BOLLINGER CO., A NEW JERSEY CORPORATION, AND JOHN A. WINDOLF, PLAINTIFFS-APPELLANTS,
v.
HOSPITAL SERVICE PLAN OF NEW JERSEY, A NEW JERSEY HOSPITAL SERVICE CORPORATION, MEDICAL-SURGICAL PLAN OF NEW JERSEY, A NEW JERSEY MEDICAL SERVICE CORPORATION, AND RICHARD C. McDONOUGH, AS COMMISSIONER, DEPARTMENT OF INSURANCE OF THE STATE OF NEW JERSEY, DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued September 24, 1973.
Reargued April 22, 1974.
Decided May 21, 1974.
*473 Before Judges COLLESTER, LYNCH and MICHELS.
Mr. Frank X. McDermott argued for appellants (Messrs. Apruzzese & McDermott, attorneys; Mr. Hugh P. Francis on the brief).
Mr. Clyde A. Szuch argued for respondents (Messrs. Pitney, Hardin & Kipp, attorneys; Mr. Richard L. Plotkin on the brief).
*474 The opinion of the court was delivered by LYNCH, J.A.D.
Plaintiffs[1] appeal from a summary judgment which declared that defendants Hospital Service Plan of New Jersey ("Blue Cross") and Medical-Surgical Plan of New Jersey ("Blue Shield")[2] acted within their statutory powers in selling student accident insurance.[3] The judgment also sustained the action of defendant McDonough, Commissioner of Insurance, in approving the policy so issued.
Appellants contend that, in issuing the student accident policies, the Plans acted beyond their statutory power and were acting as health and accident indemnity insurers without being qualified as such, without the burdens of the stringent financial requirements of the General Insurance Laws (N.J.S.A. 17:17-6 and 7), while at the same time enjoying certain tax exemptions (N.J.S.A. 17:48-18 and N.J.S.A. 17:48A-24), whereas the insurance companies for whom plaintiffs sell student accident insurance are subject to those requirements and have no such exemptions.
By letter opinion the trial judge held that (1) defendant McDonough, having approved the form of policy offered by the Plans, his action was within his statutory authority and *475 is "entitled to considerable weight in the courts"; (2) the plan for student coverage is "consistent with, rather than contrary to, the basic conception of Blue Cross-Blue Shield functions authorized by N.J.S.A. 17:48-1 et seq. and by N.J.S.A. 17:48A-1 et seq., as well as by the respective corporate charters"; (3) the proposed student coverage contract furnishes "basically the kind of protection" which has traditionally[4] been offered by the Plans, and the fact that "the proposed contract concentrates upon particular groups (students and schools) or limited area (accidents) appears unimportant since the concentration does not change the type of protection to be furnished." Finally, it was held that "N.J.S.A. 17:48-13 and N.J.S.A. 17:48A-20 give to the Commissioner of Insurance broad powers to regulate hospital and medical service plans * * *."
With all due respect to the learned trial judge, his reference to the "broad powers" of the Commissioner to regulate "hospital and medical service plans" begs the real question here: Is the student accident insurance here offered by the Plans a "hospital and medical service plan"  or is it simply "insurance," without the dominant characteristics of the "service" plans which Blue Cross and Blue Shield are concededly authorized to offer, and have traditionally provided? We note that the trial judge omitted to point out any express statutory language which authorized the Plans to issue the subject policies.
The distinction between "medical service corporations" and "health and accident insurers" was clearly set forth by our Supreme Court in Group Health Ins. of N.J. v. Howell, 40 N.J. 436 (1963), as follows:
The basic distinction between medical service corporations and ordinary health and accident insurers is that the former undertake to provide prepaid medical services through participating physicians, *476 thus relieving subscribers of any further financial burden, while the latter only undertake to indemnify an insured for medical expenses up to, but not beyond, the schedule of rates contained in the policy. The ordinary health and accident insurer makes no attempt to provide medical services as such. The primary purpose of a medical service corporation, however, is an undertaking to provide physicians who will render services to subscribers on a prepaid basis. Hence, if there are no physicians participating in the medical service corporation's plan, not only will the subscribers be deprived of the protection which they might reasonably have expected would be provided, but the corporation will, in effect, be doing business solely as a health and accident indemnity insurer without having qualified as such and rendering itself subject to the more stringent financial requirements of the General Insurance Laws, N.J.S.A. 17:17-1 et seq. Compare N.J.S.A. 17:48A-4 with N.J.S.A. 17:17-6 and 7. [at 451; emphasis added]
Thus it is that the statutes under which Blue Cross and Blue Shield operate are respectively headed "Hospital Service Corporations" (emphasis added), N.J.S.A. 17:48-1, and "Medical Service Corporations" (emphasis added), N.J.S.A. 17:48A-1. A hospital service plan is defined as a plan "whereby health care services are provided by a hospital service corporation or by a health care facility with which the corporation has a contract for such health care services * * *." (Emphasis added). N.J.S.A. 17:48-1. It is because the corporation has such "contracts" that it has a "fund" of hospitals through which it is able to supply hospital service. And "health care services" shall include "health care" provided by health care facilities described in N.J.S.A. 17:48-1. The corporation is to be operated for the benefit of its subscribers with whom it has contracted to "provide hospital service." The concept of "furnishing services" or providing "hospital care or medical care" permeates the entire statute. N.J.S.A. 17:48-1.7, 6, 6.3, 6.6 and 7. Again, thus it is that Blue Cross subscription certificates provide that the corporation will be liable "for hospital care and services" rendered by an "Approved Hospital," and payment is made directly to such hospital unless a subscriber has made payment to it for services for which the Plan is liable, in which event the subscriber is reimbursed in such amount as the Plan would be required to pay such hospital.
*477 So, too, under N.J.S.A. 17:48A-1 et seq., the concept of furnishing medical "services" is the power granted to "Medical Service Corporations." Such powers  and not the power to do business as a "health and accident indemnity insurer"  are those granted to such corporations. So it was held in Group Health Ins. of N.J. v. Howell, supra.
We note that N.J.S.A. 17:48A-1 provides that a medical service corporation is organized "for the purpose of establishing, maintaining and operating nonprofit medical service plans, or to provide or pay for medical services * * *." It might be argued that the corporation is therefore authorized to "pay for" such services as an insurer  a right not granted to Hospital Service Plan corporations under N.J.S.A. 17:48-1 et seq.  and that the statute gives a power of indemnity to a Medical Service Plan corporation. We note also, however, that the payment is principally to be made to the physician. Thus it is that Blue Shield's subscription certificate provides that payments thereunder shall be made to the "Participating Physician" or other "Eligible Physician" unless the physician certifies he has been paid, is a non-participating physician, or the charge is made by a corporation, hospital clinic or group which includes other than participating physicians. In those cases payment may be made to the subscribers.
Despite the provisions of the statute just recited, the dominant theme of the relevant statute is, in line with the holding in Group Health Ins. of N.J. v. Howell, supra, that the Medical Service corporation is to provide service. It is to that end that "participating physicians" agree in writing to perform the medical services, and thus there is created the "fund" of physicians which enables the corporation to fulfill its function of providing medical services. As Chief Justice Weintraub said in his dissent in the second Group Health Ins. case, 43 N.J. 104 (1964):
As was pointed out in our earlier opinion in this litigation, Group Health Ins. of N.J. v. Howell, 40 N.J. 436, 451 (1963), the essential *478 difference between the plan authorized by the statute and the usual contract of insurance is that whereas the usual insurance contract provides for the payment of fixed dollar indemnities, the plan before us contemplates that the medical service will be furnished under agreements between the medical plan and participating physicians requiring the physician to accept scheduled payments from the medical plan in full payment for his services. [at 115-116; emphasis added]
We therefore hold that the "pay for" provision in the Medical Service Corporation Act does not grant insurance powers to the corporation, and must be merely incidental to its main purpose, i.e., providing "services."
Indeed, the Plans do not here contest the contention that, in offering the student accident policies, they are acting as "insurers." They point out that the Plans are a form of insurance. But they assert:
Defendants submit a determination to that effect is not relevant to the question sub judice, to wit, whether the Plans have authority pursuant to N.J.S.A. 17:48-1 et seq. and N.J.S.A. 17:48A-1 et seq. and to their respective charters to sell the student accident insurance policy in issue.
But where in the cited statutes is there such authority? As noted above, the trial court did not point to any provision of the statutes which grants it, nor is any such provision cited by defendants. And we can find none.
It is true that some aspects of the Plans' traditional functions partake of "insurance" characteristics. For example, Blue Cross, under its traditional Hospital Service Plan, for a premium, promises to pay a hospital on the contingency that the subscriber is hospitalized, and Blue Shield, under its Medical Service Plan, for a premium, promises to pay a physician on the contingency that he treats one of its subscribers. Thus, those aspects of the Plans have some characteristics of "insurance." But the Plans are not precluded from such undertakings, for the reason that those incidents of their functions are within the statutory powers granted to them under N.J.S.A. 17:48-1 et seq. and N.J.S.A. 17:48A-1 et seq., pursuant to which they provide their *479 "service" plans. The question turns not on whether risk, or some other characteristic of insurance is involved, but on what is its primary or principal object. Jordan v. Group Health Ass'n, 71 App. D.C. 38, 107 F.2d 239 (1939). Absence or presence of assumption of risk or peril is not the sole test to be applied in determining whether the undertaking is "insurance" or not. "The question, more broadly, is whether, looking at the plan as a whole, `service' rather than `indemnity' is its principal object and purpose." California Physicians' Service v. Garrison, 28 Cal.2d 790, 809, 172 P.2d 4, 16 (Sup. Ct. 1946). It was in applying that principle that our Supreme Court, in the first Group Health Ins. case, supra, distinguished between "service" corporations and "ordinary health and accident insurers." 40 N.J. at 451. That analysis would exclude Blue Cross' Hospital Service Plan and Blue Shield's Medical Service Plan from the business of insurance because, in essence, they are "service" contracts  they offer services, respectively of hospitals and participating physicians.
What, then, of the student accident policy here proffered? Unlike the Hospital and Medical Service Plans there is no undertaking to provide "services" through either hospitals or participating physicians. Cf. Group Health Ins., supra, 40 N.J. at 45. In fact, under this policy Blue Cross is not obligated to have "contracts" with hospitals (as it must under N.J.S.A. 17:48-1) so that it could provide services of such institutions to the covered student. Nor, under this policy, does Blue Shield offer agreements by participating physicians to perform services, as provided by N.J.S.A. 17:48A-1. All this policy offers is to pay "benefits" for the 15 items for which the student may have incurred obligations due to accident and up to the limit of $10,000. Items 1 through 9 indemnify against what may be termed "non-physician" services and supplies. Items 10 through 15 may be termed "physician" services and supplies. But no such services or supplies are offered in the subject policy. Again, all that the policy provides is that it indemnifies the subscriber for *480 the obligation to pay which the subscriber has incurred. The risk is shifted from him to Blue Cross and Blue Shield. Unlike the method of payment in the traditional Hospital Service Plan (N.J.S.A. 17:48-1) where payment is made to the hospital under "contract" with the Plan, under this policy there is no hospital under contract with Blue Cross. Any hospital, whether or not it has a contract with Blue Cross, comes within the definition of "Hospital" under this policy (Art. III, 8).
Payment for items 1 through 9 is made to the covered student's parents or guardian, provided, of course, that the contingency, i.e., the accident, occurred while at or going to or from school or during other school related activities. As to items 10 through 15 ("physician" services and supplies), payment is to be made directly to the physician, but where he is a New Jersey physician not participating in Blue Shield's Prevailing Fee Program, or he certifies he has been paid, or the charge for the service is made directly or indirectly by a corporation, hospital clinic or group which includes New Jersey licensed physicians not participating in the Prevailing Fee Program, again the payment under the policy is made to the covered student's parents or guardian.[5]
This policy in no way differs from an accident policy issued by an ordinary insurance company except for its "excess" features.[6] It is a "contract or promise, based upon valid consideration to compensate the insured or other persons designated by the policy for loss sustained upon the occurrence of some contingency." 12 Appleman, Insurance law and Practice, § 7001 at 3 (1943) (emphasis added). It is "a contract to pay a sum of money upon the happening *481 of a particular event or contingency." 1 Couch on Insurance 2d, § 1.2, at 28 (1959). See also, State v. Community Health Service, Inc., 129 N.J.L. 427, 429 (E. & A. 1943). And it is no more than that, for there is no agreement to provide services.
"Services" (plural) has been defined as "any result of useful labor which does not produce a tangible commodity; in economics, such business concerns as railroads, telephone companies, laundries and such persons as physicians are regarded as performing services." (Emphasis added). Fennell v. South Carolina Tax Comm'n, 233 S.C. 43, 103 S.E.2d 424, 426 (Sup. Ct. 1958), quoting the definition which is found in Webster's New International Dictionary (2d ed. 1950) at 2288. Webster also defines "service" (singular) as: "performance of labor for the benefit of another; the deed of one who serves; * * * act or instance of helping, or benefiting; conduct contributing to the advantage of another or others * * *." "Services" (plural) has been defined as "`any act performed for benefit of another under some arrangement or agreement whereby such act was to have been performed.'" See Skrivanich v. Davis, 29 Wash.2d 150, 161, 186 P.2d 364, 370 (Sup. Ct. 1947); Faul v. C.I.R., 263 F.2d 645, 649 (9 Cir.1959). Again, "service" is action or use furthering some end or purpose, conduct of performance assisting or benefiting someone or something; deeds useful or instrumental towards some object. Van Zandt v. Fort Worth Press, 359 S.W.2d 893, 895 (Tex. Sup. Ct. 1962).
In essence, therefore, "service" or "services" contemplate an act or deed and not mere payment of money. No such act or deed is provided for in this policy. Payment of money is alone provided for under the student accident policy here offered by the Plans.
In Maloney, Inc. Com'r v. American Independent Med. & H. Ass'n, 119 Cal. App.2d 319, 259 P.2d 503 (D. Ct. App. 1953), the court held that where a corporation had agreed, in return for dues paid, to indemnify beneficiary members against hazards of illness or injury by paying medical and *482 hospital bills in accordance with a schedule in the beneficial membership certificate, but the corporation did not employ physicians or contract with hospitals, and the only service rendered by the corporation was payment of members' bills, the corporation was transacting insurance business. The corporation had defended on the theory that its corporate charter had authorized it to contract with physicians and hospitals for the purpose of making available to its members and hospital services, and that § 9200 of the California Corporation Code authorized it to render "services." The court said:
There is no merit in the contention that AIM was merely rendering a service to its members, as distinguished from transacting an insurance business, and there is nothing in the cases cited which compels or supports such a conclusion. On the contrary, the business transacted by AIM constitutes an insurance business as defined in California Physicians' Service v. Garrison, 28 Cal.2d 790, 172 P.2d 4, 167 A.L.R. 306. By the certificates of beneficial membership issued AIM agreed that it would make the specified benefits available to the member when needed, in return for the dues paid. AIM employed no physicians and made no contracts with hospitals, and its contract clearly discloses that it was itself rendering or furnishing no such service. The member, when needing such services, was to secure them wherever he desired and anywhere in the world. The corporation agreed to pay the bills therefor, within specified limits, and this was not dependent upon the amount of dues that might be collected from other members within any period. Under this contract AIM undertook to indemnify the beneficiary member against the hazards of illness or injury by paying the medical and hospital bills specified. There was no agency here, other than that common to any insurance contract, and the business here transacted was not a mere rendering of service within the principles established in the case of California Physicians' Service v. Garrison, supra. While the assumption of a risk is not the sole test of the status involved, there was here a definite assumption of risk on the part of the corporation, and not merely one assumed by the doctors and hospitals as argued by the appellants.
No service was rendered or to be rendered by AIM other than that of paying the bills incurred by the members, in accordance with its agreement; the doctors were to get a fixed fee regardless of the amount of dues collected; any increase of illness or injury would increase the cost to AIM; and whether benefits were to be furnished, and the amount furnished, was dependent upon chance. Viewing the plan of operation as a whole, it clearly appears that its only object *483 and purpose was in the nature of an "indemnity" and not merely the furnishing of a "service". The findings that AIM was transacting insurance business in this state without the certificate required by section 700, and that it was insolvent within the meaning of the provisions of the Insurance Code, are fully supported by the record. [259 P.2d at 506; emphasis added]
So here. And the fact that Blue Cross and Blue Shield may have contracts with hospitals and participating physicians for use pursuant to their traditional Hospital Service and Medical Service Plans avails them nothing here where they have written what is plainly and simply an accident insurance policy. In doing that, as said in Group Health Ins., supra, they are "doing business solely as a health and accident indemnity insurer without having qualified as such and rendering itself subject to the more stringent financial requirements of the General Insurance Laws, N.J.S.A. 17: 17-1 et seq. Compare N.J.S.A. 17:48A-4 with N.J.S.A. 17:17-6 and 7," 40 N.J. at 451. We might add that, unlike commercial insurance companies, the Plans are availing themselves of exemption from taxation as charitable and benevolent institutions, except that Blue Cross is not exempt from taxes on real estate and equipment. N.J.S.A. 17:48A-24 and N.J.S.A. 17:48-18. Their authority as "service" corporations cannot be construed as granting such exemptions when they write accident insurance policies such as here.
The dichotomy between "service" contracts not within insurance laws, and contracts partaking of "service" characteristics but encroaching into impermissible areas of insurance, is demonstrated by the respective decisions in California Physicians' Service v. Garrison, supra, and People v. California Mutual Ass'n, 68 Cal.2d 677, 68 Cal. Rptr. 585, 441 P.2d 97 (Sup. Ct. 1968). In the former the plaintiff (CPS) sought a declaratory judgment that it was not engaged in the business of insurance. CPS was organized by the medical profession of California to make available medical care to those of lower income. Under its plan CPS did not promise *484 its beneficiary members that it would provide medical care, but the services which were offered to them were offered personally by the professional members of CPS, with payment to them from the fund. The court found that the corporation itself assumed no risk and that all risk was assumed by the physicians. Citing among other decisions State v. Community Health Service, Inc., supra, for the proposition that hazard and risk are the significant elements of "insurance," the court held that since CPS assumed no hazard or risk (and because the beneficiary members incurred no liability which could be the risk insured against), its operation was "unquestionably" a "service of high order" and not "indemnity or insurance."
On the other hand, in People v. California Mutual Ass'n, supra, the Association (CMA) was formed to make payments in limited amounts for medical and hospital services rendered to its members, using funds derived from periodic dues. CMA had contracts with some physicians who agreed to look exclusively to CMA for payment of the scheduled fee, but reserved the right to charge an amount in excess of the specified fee. CMA encouraged the use of the services of physicians with whom it had contracts but, as a matter of practice, paid the bills of physicians independently chosen by a member in areas where it had no such contracts. The court, after pointing out that, in its previous decision in CPS, indemnity features were only incidental and the beneficiary members incurred no liability for the services which were to be indemnified, modified its decision in CPS and said:
In determining the nature of a plan, we are cognizant of two policy considerations. Where indemnity features are present, the member bears the risk of personal liability for medical services. This is the insurance risk which can be protected against by financial reserves to assure that the member will recive the benefits for which he has paid. On the other hand, there is a strong social policy to encourage the services which health plans provide the public. In 1946 when the California Physicians' Service case was decided, the health plan concept was new to California. Although today there are over *485 53 health plans in California, as the committee noted, "care must be taken to always make it possible for new plans to enter the stage, for health is a commodity which has too few purveyors." (15 Assembly Interim Committee Report No. 26, Finance and Insurance (1961-1963) p. 36.)
Any workable test must be a compromise of these two policies. A finding that the principal object and purpose of a plan is direct service merely establishes that the indemnity feature is not dominant, yet, a substantial minority of the members may face liability without the security of financial reserves. We, therefore, conclude that where indemnity is a significant financial proportion of the business, the organization must be classified as an "insurer" for the purposes of the Knox-Mills Plan Act. The principal object and purpose test as enunciated in the California Physicians' Service case does not provide for adequate financial security.
We realize that this determination involves balancing the indemnity aspects against the direct service aspects of the business, but only in the context of the plan as a whole can it be determined whether the indemnity feature is so significant as to warrant imposing the Insurance Code financial reserve requirements. Nor, should this requirement unreasonably restrict the development of new health plans or impinge on the growth of existing plans. Health care service plans were given special legislative treatment because of the direct service feature. Only so long as the plans pursue and achieve that objective is the public assured that the protection of the Insurance Code is not necessary.
Although CMA's contracts with the 38 physicians provide for direct service without indemnity, the remainder of the plan is one of insurance. A member is liable for medical services procured from the Riverside foundation, the seven physicians who did not limit themselves to seek payment exclusively from CMA, those physicians who treated members in geographical areas where CMA did not have contracts, and any hospital rendering treatment. [68 Cal. Rptr. at 588-589, 441 P.2d 100-101; emphasis added]
Since the record before it was not adequate to determine to what extent indemnity features were present at the time of the appeal, the matter was remanded for a determination of that question as to the status of CMA as a health care service plan or as an insurer.
We have no such obscurity here. Certainly "indemnity is a significant financial portion" of the proposed student accident policy. Clearly, as to the "hospitalization" services and supplies (items 1 to 9 in Art. V of the contract), indemnity or "insurance" is the nature of the Plans' participation, *486 for payment is made to the student's parents or guardians for the charges incurred. And as to the "physician's" services and supplies (items 10 to 15 in Art. V), the member, in the words of the AIM case, supra, "when needing such services, was to secure them wherever he desired and anywhere in the world" (emphasis ours) and, if the physician is a "non-participating" New Jersey physician, or any physician certifies he has been paid, or the charge is made by a corporation, hospital clinic or group including nonparticipating New Jersey physician, then, in those instances also, payment is made to the covered student's parents or guardian. Thus, in at least a "significant" variety of instances, the member's liability to pay for the services and supplies is indemnified by the Plan's policy of accident insurance. Thus the policy is diametrically opposite to the "service" plan sustained in State v. Community Health Service, Inc., supra, as to which the court said:
The defendant does not undertake to pay such debt as the subscriber may incur for medical services. The contract is not one of indemnification. The defendant does not promise to indemnify the subscriber against any loss. [129 N.J.L. at 428]
Such undertakings and promises are made in the subject policy. It is "insurance" with little, if any, characteristics of "service."
To construe the Blue Cross and Blue Shield statutes, as defendants urge, so as to permit them to offer student accident insurance without the burdens imposed on insurance companies,[7] while permitting them to enjoy privileges[8] not granted to such companies would, in our view, deny insurance companies equal protection of the laws in violation of the Fourteenth Amendment of the United States Constitution *487 and Art. 1, ¶ 5 of the Constitution of the State of New Jersey.
Equal protection under the laws was defined by our Supreme Court in Washington National Ins. Co. v. Board of Review, 1 N.J. 545 (1949), where the court said:
The equal protection clause means that the right of all persons must rest upon the same rule under similar circumstances, and that it applies to the exercise of all the powers of the state which can affect the individual or his property, including the power of taxation. * * * While the due process and equal protection guarant[ees] are not coterminous in their spheres of protection, equality of right is fundamental in both. Each forbids class legislation arbitrarily discriminatory against some and favoring others in like circumstances. It is essential that the classification itself be reasonable and not arbitrary, and be based upon material and substantial distinctions and differences reasonably related to the subject matter of the legislation or considerations of policy, and that there be uniformity within the class. The equal protection of the laws means that no person or class of persons shall be denied the protection of the laws enjoyed by other persons or classes of persons under similar conditions and circumstances, in their lives, liberty, and property, and in the pursuit of of happiness, both as respects privileges conferred and burdens imposed. * * * This includes equality of exemption from liabilities. [at 553-554; emphasis added]
Since there is no "substantial distinction" between the policy here sought to be offered and those offered by a commercial carrier, defendants, in arguing that their source statutes authorize the student accident policies, would have us construe those statutes in an unconstitutional sense. A court has a duty to construe a statute so as to render it constitutional if it is reasonably susceptible of such a construction. Woodhouse v. Woodhouse, 17 N.J. 409, 416 (1955); 2A Sutherland, Statutory Construction (4th ed. 1973), § 56.04, at 408. If it is fairly and reasonably open to more than one construction, that construction will be adopted which will reconcile the statute with the Constitution and avoid the consequences of unconstitutionality. Black on Construction and Interpretation of Law (2d ed. 1911), § 41 at 110, citing, among other cases, Road Comm'n v. Harrington *488 Tp., 55 N.J.L. 327 (E. & A. 1893). We are therefore impelled to reject the construction of the statutes as contended by the Plans.
We conclude that the judical power is here severely restrained and that the language of our Supreme Court in Burlington Cty. Evergreen Pk. Mental Hosp. v. Cooper, 56 N.J. 579 (1970), in an analogous setting, is our polestar:
In situations where such an important public policy matter is involved the proper course for the judicial branch of the government to follow is to deny the power and to assume that if the legislative branch desires PERC to have the authority, it will bestow it in unmistakable terms. [at 599]
If the Legislature wishes to bestow upon the Plans the powers we would deny them, here too, it can do so "in unmistakable terms" by legislative enactment.
Reversed.
NOTES
[1] The members of plaintiff New Jersey Association of Independent Insurance Agents are in the business of selling student accident insurance together with other types of insurance. Plaintiff C.W. Bollinger Co., a member of the Association, is an independent agent and broker and is said to administer accident insurance for approximately two-thirds of all schools and school districts in New Jersey. Plaintiff Windolf is president of C.W. Bollinger Co. and is also a direct payment subscriber of Blue Cross and Blue Shield. All plaintiffs will be referred to collectively as "plaintiffs."
[2] Collectively, Blue Cross and Blue Shield are hereafter sometimes called the "Plans."
[3] The complaint also charged that defendants acted beyond their powers in issuing a policy offering students benefits for dismemberment or death, but the judgment below did not involve that issue and it is therefore not before us. All parties nevertheless agree that we shall consider the judgment as "final."
[4] The subscription certificates ordinarily issued by defendants under their Hospital Service Plan and Medical Service Plan will sometimes be referred to as "traditional" plans.
[5] Prior to a 1944 amendment payment could only be made to natural persons who were participating physicians or physicians who would, except for residence, be eligible to become participating physicians. L. 1940, c. 74, § 8.
[6] Payment of benefits will not be made where benefits are available under any other insurance program.
[7] Capital and assets required of insurance companies  N.J.S.A. 17:17-6 and 7.
[8] Exemption from taxation granted to the Plans  N.J.S.A. 17:48-18 and N.J.S.A. 17:48A-24.