230 N.J. Super. 265 (1988)
553 A.2d 371
ERNEST F. SZABO, PLAINTIFF,
v.
NEW JERSEY STATE FIREMEN'S ASSOCIATION, DEFENDANT.
Superior Court of New Jersey, Chancery Division Bergen County.
June 21, 1988.
*267 Robert T. Tessaro, for plaintiff.
Barry T. Parker, for defendant (Parker, McCay & Criscuolo).
LESEMANN, J.S.C.
Cross motions for summary judgment in this case raise important questions as to the meaning and constitutionality of statutes establishing and governing the New Jersey State Firemen's Association as well as local firemen's relief associations throughout this state. Those associations hold and administer substantial funds ("The Firemen's Relief Fund") contributed by a 2% tax on fire insurance premiums charged by non-New Jersey insurers on policies insuring property within this state. In 1987 that tax produced over $7,000,000 for the state and local associations. As set out in the most recent information provided, the local relief associations hold approximately $35,000,000 and the State Association approximately $3,800,000.
Plaintiff is a member of the fire department of the Borough of Fort Lee. He became a member in December 1986, when the governing body of the municipality approved his application for membership.
After that approval, plaintiff's application for membership in the Fort Lee Firemen's Relief Association, which would make him eligible for the benefits provided by the statutes referred to above, was processed through the Fort Lee relief association, and forwarded to the State Association. The State Association *268 rejected the application on the grounds that plaintiff had "OS blindness" in one eye and a lack of depth perception in the other eye.
That action did not affect plaintiff's membership in the Fort Lee fire department. It simply denied him membership in the relief association. Thus, he remained a fireman but he and his dependants (if any) were ineligible to receive welfare, and possible death benefits, available to firemen who are also members of the relief association. Plaintiff thereupon filed this suit which not only challenged the State Association's power to reject his application, but also went considerably beyond that limited claim and challenged the legitimacy of virtually the entire program of administering the Firemen's Relief Fund through the State Association and some 521 local associations.
That challenge by plaintiff raises interrelated issues dealing with statutory interpretation, the validity of certain rules of the State Association, and the constitutionality of the statutory plan which created both the State Association and the local associations. He claims that the State Association has no power to deny membership or benefits to any municipal fire fighter, whether based on a physical examination, a "quota" system, or for any other reason. Rules that purport to qualify the right to membership, he claims, are invalid. So too, he says, are certain rules discussed below which declare benefits payable by the association to be "gratuities or voluntary payment" and which call for the forfeiture of all benefits by anyone who challenges a decision of the Executive Committee.
Plaintiff submits two constitutional claims:
First, he contends that the payment of tax money to the state and local associations constitutes a donation or appropriation of money to a private entity. He says that payment violates our state constitution[1] since the funds "are not being expended for *269 a public purpose," are being managed and controlled by a private association without governmental control, and because the statutory scheme under which such payments are made is vague and "lacking in adequate standards for control over the tens of millions of dollars" involved. Plaintiff seeks a declaration of unconstitutionality and a direction that all funds held by or under the control of the State Association be declared property of the State of New Jersey.
Second, plaintiff claims that the statutory delegation of rule-making authority to the State Association lacks "adequate standards." He contends that it grants "final and unfettered determination" over participation in a governmental function to a private body without public accountability, is vague, "unreasonable, arbitrary and capricious," and thus represents an unconstitutional delegation of legislative authority contrary to Article IV, section 1, paragraph 1 of the New Jersey Constitution.
Before discussing those claims, some preliminary discussion  first of the statutory scheme and then of certain regulations adopted by defendant  is required.

A. THE APPLICABLE STATUTES.
The statutes regulating "local firemen's relief associations" are contained in N.J.S.A. 43:17-1 through 43:17-39. They constitute "Article 1" of Chapter 17 of Title 43.
The related statutes dealing with the "New Jersey State Firemen's Association" appear as Article 2 of that chapter, and consist of N.J.S.A. 43:17-40 through 43:17-47. Both articles were originally adopted in 1885. (L. 1885, c. 122) and have continued in existence with some amendments, but with the overall structure essentially unchanged, from then until now.
*270 Article 1 provides, in N.J.S.A. 43:17-1, that in any municipality where "there now are or hereafter may be organized" one or more fire companies "under the supervision or control" of the municipal governing body, the members of those fire companies may become incorporated as the "Firemen's Relief Association" of that municipality.[2] Each municipality is to have just one relief association so that if there is more than one fire company in a municipality, the different companies are required to unite in the formation of just one association. N.J.S.A. 43:17-7.
N.J.S.A. 43:17-3 sets out the object of local relief associations:
(T)o establish, provide for and maintain a fund for the relief, support or burial of indigent exempt firemen and their families, and of any persons and the families of any persons who may be injured or killed while doing public fire duty, or may become indigent or be disabled or may die as the result of doing such duty or may be prevented by the injury or by sickness arising from their doing such duty, from attending to their usual occupation or calling.
N.J.S.A. 43:17-9 is a key section and deals with the membership of local relief associations. It reads as follows:
The membership of such corporation (the local relief association) shall consist, without any formal election thereto, of the officers and members of such fire ... companies ... as shall be under the supervision or control of the governing board or body of the municipality....
Local relief associations are governed by what is termed a "board of representives" (N.J.S.A. 43:17-11) consisting of representatives from the constituent fire companies within the municipality together with the municipal fire chief. Applications for relief assistance, however, are handled by a different body called the "board of visitors or trustees," (N.J.S.A. 43:17-24) *271 some of whom are elected by the constituent fire companies and some of whom are chosen by the board of representatives. N.J.S.A. 43:17-13. That board (hereinafter "the trustees" or "board of trustees") is empowered to approve or deny requests for assistance. However, according to N.J.S.A. 43:17-35, they are required to take that action pursuant to "rules and regulations" established by the State Association.[3]
The actions of the trustees must also be reported annually to the Secretary of State, by a sworn statement setting out, among other things, the receipts and expenses of the association during the year and an accounting of funds then on hand. A copy of that statement is also to be sent to the State Association, whose executive committee is required to "determine whether the local association has complied with the requirements of this chapter relating thereto." N.J.S.A. 43:17-31.
As noted, N.J.S.A. 43:17-41 through 43:17-47 provide for the organization, existence and operations of the State Association. N.J.S.A. 43:17-42 provides that each local association shall select three delegates to the convention of the State Association, and those delegates, together with the municipal fire chief, are to elect the officers of the State Association. Those elected officers, plus others designated in the organization's constitution, make up the "executive committee" of the Association.[4]
*272 N.J.S.A. 43:17-45 deals with the supervisory powers of the executive committee of the State Association over the local associations and is the counterpart of N.J.S.A. 43:17-35. Section 45 states that
The executive committee .... shall have the supervision and power of control of the funds and other property of all firemen's relief associations, shall see that the same are properly guarded and legally invested and expended and shall examine the annual reports of each association.
The executive committee is required to file with the Commissioner of Insurance a list of local associations which have complied with the law and,
Only associations so reported shall be entitled to the pro rata share of the monies in the commissioner's hands arising from the two percent on premiums. [N.J.S.A. 43:17-45].
The "two percent on premiums" referred to in N.J.S.A. 43:17-45, of course, refers to the tax levied on non-New Jersey insurance companies respecting policies they write on property located in this state. The tax is imposed by N.J.S.A. 54:18-1, and its allocation and use are governed by that statute together with N.J.S.A. 54:17-4.
In brief, the statutes provide that, except for certain payments to the New Jersey Firemen's Home,[5] the proceeds of the two percent tax are to be paid to the State Association, or directly to the various local associations in proportion to the premium amounts which emanate from each municipality. In the early years of the program, foreign insurance companies actually made payments directly to the local associations. In recent years, however, all payments have been made to the State Association. An organization known as the Insurance Service Organization compiles data as to premiums charged by *273 foreign insurance companies in each municipality, and based on that data an allocation formula for the entitlement of each municipality is created. After receiving the total funds, the State Association deducts a prescribed amount and then distributes the balance to the local associations pursuant to the allocation formula, but with a minimum of at least $2,500 to each municipality. At present, the state share of the total fund is 52% with the remaining 48% distributed to the local associations. From its 52% the state administers a burial fund through which, subject to certain qualifications and possible exceptions discussed below, the family of a deceased member who has met certain requirements is entitled to a death benefit of $3,200.[6] The local association administers the "relief," or welfare, portion of the program.

B. RULES ADOPTED AND NOT ADOPTED BY THE STATE ASSOCIATION.
The division of responsibility between the state and local relief associations (together with the accompanying division of receipts between the two) results from an exercise by the State Association of the rule making power given it by N.J.S.A. 43:17-35 and 43:17-45. Another example of the exercise of that power is the State Association's adoption of a set of regulations entitled "General Relief Fund Rules" ("the Rules"). The document is in some respects a curious one. Both for what it says and for what it does not address at all, it represents the focus of part of plaintiff's attack.
The Rules begin with a preamble stating that the "fundamental and primary purpose" of the State and local associations is "to provide relief for indigent fire persons, their widows, widowers and ophans. That sentiment, however, is followed by an extraordinary statement:

*274 Any and all benefits and claims payable hereunder have always been gratuities or voluntary payments with the Association, and not property rights or the subject of judicial process, and are hereby so declared and determined. Accordingly, legal proceedings in any Court for or against any such benefit or claim hereunder shall be considered and is hereby determined to be contrary to the purposes of this Association, and any such proceedings shall forthwith operate as a bar and forfeiture of any and all benefits or claims or monies otherwise payable hereunder.
The Rules establish an Advisory Committee to pass upon death benefit claims submitted to the State Association and provide for a right of review by the Executive Committee. After doing that, however, they then set out another statement, as unwarranted and inappropriate as the one quoted above:
The remedies provided herein are believed to be so complete that it is hereby determined that any claimant who instituted legal proceedings in any court without the consent of the Executive Committee shall thereupon be barred and forfeit any and all claims he, she, or they might have had. (Art. II, Sec. 10)
Article IV, Sec. 2 of the Rules purports to list criteria for membership, one being the passing of a physical examination. However, the Rules do not contain any criteria concerning that examination nor do they describe what standards are to be applied in determining whether one passes or fails such an examination.
The Rules also contain a lengthy and complex description of a so called "quota system", limiting membership, and thus eligibility for death benefits in certain municipalities. See, Art. V, Sec. 1 through 5. The system had developed because the State Association, at one time, felt that the large number of eligible fire fighters in the state jeopardized the stability of its fund. To counter that, it imposed numerical limits on the number of fire fighters who would be admitted to membership in different sized municipalities. If a municipality had more fire fighters than its imposed quota number, the additional fire fighters had to wait for openings within the quota before they could become eligible for death benefits. Generally the system operated to limit more densely populated municipalities.
At one time the quota system apparently represented a serious problem in the operation of the association and the *275 payment of death benefits. However, there is today a "shortage" of fire fighters and thus, for all practical purposes, the quota system is not applied. Plaintiff says the association has no power to establish any such quota, and death benefits should be available to all fire fighters appointed by any municipality. So long as the quota system remains in the Rules, he says, it can be imposed at any time. Accordingly, he asks for a declaration of its invalidity.
The Rules are also significant for what they do not say. Despite the direction of N.J.S.A. 43:17-35, the State Association has not promulgated rules and regulations, or even guidelines, to be followed by local associations in dealing with relief claims. There is no definition or test for "need." There are no limits or guidelines respecting income or assets. There is no list of eligible or ineligible expenses, or any indication as to what criteria is to be applied in deciding whether to accept or reject a claim.[7] Questioning of counsel has also made clear that few if any local associations have adopted any rules of their own. In most cases applications for benefits are decided on a case by case basis and are subject to arbitrary determination by officials of the 521 local associations acting without any published or otherwise established criteria.[8]

*276 C. PLAINTIFF'S CLAIM.
In dealing with plaintiff's constitutional claims two basic and well established principles apply.
First, constitutional questions should be considered and decided only when necessary. If an issue presented as a constitutional question can actually be resolved by interpretation of a statute, the latter course should be followed and the constitutional question need not be addressed:
It is a well established precept of constitutional law that constitutional questions are to be avoided if the case can be disposed of on ... other grounds.... [American Bank & Trust Co. of Pa. v. Lott, 193 N.J. Super. 516, 521 (App.Div. 1984)]
And, to the same effect see, e.g., Hagans v. Lavine, 415 U.S. 528, 94 S.Ct. 1372, 39 L.Ed.2d 577 (1974); Donadio v. Cunningham, 58 N.J. 309, 325-326 (1971); Ahto v. Weaver, 39 N.J. 418, 428 (1963).
Second, if a statute is reasonably susceptible to two possible interpretations  one of which would lead to the statute being held constitutional and the other to a contrary conclusion  the construction which would uphold the statute should be adopted:
There is a well-settled rule of construction that where there are two possible interpretations of a statute or an ordinance, by one of which the law would be unconstitutional and by the other it would be valid, a court should adopt the construction which will uphold the law. [Adams Newark Theatre Co. v. Newark, 22 N.J. 472, 478, aff'd, 354 U.S. 931, 77 S.Ct. 1395, 1 L.Ed.2d 1533 (1956)] [Id. at 478].
See also, Ahto v. Weaver, 39 N.J. 418 (1963); City of Clifton v. Passaic Cty. Bd. of Taxation, 28 N.J. 411 (1958). And see N.J. State Bd. of Higher Ed. v. Bd. of Directors of Shelton College, 90 N.J. 470, 478 (1982) where the court set out the same principle in slightly different language:
Under New Jersey law, a challenged statute will be construed to avoid constitutional defects if the statute is "reasonably susceptible" of such construction.
*277 In Jordan v. Horsemen's Benevolent and Protective Association, 90 N.J. 422 (1982), our Supreme Court applied those principles in a case raising constitutional issues similar to those raised here. Despite claims by both plaintiff and defendant  for opposite reasons  that the Jordan case is significantly different from this case, the fact is that the cases are remarkably similar and the Court's reasoning in Jordan is applicable and most helpful here.
Jordan involved a statute, N.J.S.A. 5:5-66 et seq., which required that a specified percentage of the total amount bet at race tracks be made available "for programs designed to aid ... horsemen and their representatives." An organization known as the New Jersey Horsemen's Benevolent and Protective Association, which was part of a national organization with a similar name, was designated to receive the funds (approximately $600,000 per year) and administer the program. Roughly one half of the amount received was used to pay benefits under the program and the remainder was used for overhead (including travel and entertainment) and payments to the national group to cover a portion of that organization's operating costs.
Plaintiff challenged the statutory scheme on the grounds that it constituted "special legislation" and also involved payment of public money for a private purpose. The Court held that, properly construed, the statutory scheme was valid. It found that the statute,
is reasonably susceptible to a construction that will free it from constitutional defects.... In an area subject to pervasive legislative control, we believe that the Legislature would prefer that the statute survive with appropriate modifications rather than succumb to constitutional infirmities. [90 N.J. at 435]
To accomplish that result, the Court molded the statute before it so as to create a rational and constitutional pattern. In three areas it implied into the statute provisions which were not otherwise apparent, in order to provide a basis to uphold the legislative enactment.
*278 First, the Court held that, although the Horsemen's Association was to administer the fund, benefits under the plan must be available to all horsemen in the state, regardless of association membership. The association would not be permitted to deny benefits to non-members.
Second, the Court imposed restrictions on use of the state appropriated funds. The funds, it held, could be used only to finance "benevolence programs and the administrative and overhead costs reasonably related to those programs". They could not be used to finance any other operations of either the state or the national association.
And finally, although the statute said only that the association was to file financial reports with the state treasurer and the state racing commission, the court implied a duty on the part of those officials to examine and audit those submissions. In that way, the Court held, there could be assurance that the statute was not "being used to advance private interests under the guise of general welfare," and the statute's constitutionality could be upheld.
The Jordan analysis is particularly applicable here because plaintiff's constitutional attacks are premised on particular interpretations which he (and sometimes the defendant) assign to the statutes in question. If in fact the statutes do not have that meaning, if they are "reasonably susceptible" to a different construction which would obviate the constitutional difficulty, the challenge on constitutional grounds loses its force.
Thus, plaintiff claims that dedication of the 2% tax to the State and local relief associations is an unconstitutional donation or appropriation of money to private organizations. However, it is clear that payment to a private association is not necessarily unconstitutional so long as it serves a public purpose. See, e.g., Hill v. City of Summitt, 64 N.J. Super. 522, 530 (Law Div. 1960):
Fulfillment of a public purpose is adequate consideration to sustain a state donation or appropriation ...
*279 See also Mt. Laurel Tp. v. Public Advocate, 83 N.J. 522, 534 (1980); Hoglund v. City of Summit, 28 N.J. 540, 548-49 (1959).
Plaintiff acknowledges that proposition. And he also acknowledges that the payment of benefits to fire fighters would "arguably" meet the public purpose test.[9] He contends that the statutory scheme here is nevertheless unconstitutional because the Association arbitrarily excludes certain fire fighters from the receipt of benefits, because the state and local associations are not required to account for their expenditure of funds, and because a portion of the funds are used for private purposes, including convention expenses.
Thus, in weighing plaintiff's attack, the first question is whether the statutes really do mean what plaintiff says they mean. Or, to paraphrase the Court in Jordan, are the statutes "reasonably susceptible to a construction that will free them from the constitutional defects."
And the same is true concerning plaintiff's second, related, constitutional argument: that the statutory delegation to the State and local associations of the power to determine who does and does not receive benefits, and what those benefits should consist of, is an unconstitutional delegation of legislative power to private organizations. That argument is premised on plaintiff's *280 hypothesis that the grant of discretionary authority exists without any standards, and constitutes what plaintiff describes as "virtually unfettered rule making authority." Here too, the first question is one of statutory interpretation: whether it is true that there are no standards, express or implied, to guide and limit whatever grant of discretionary authority may be contained in the statutes. For if there are adequate standards, the constitutional question raised by plaintiff disappears from the case and need not be answered.
In dealing with those questions of statutory interpretation, the first issue to be addressed here will be that of membership in the state and local associations and eligibility for benefits. Next will be the question of standards, or the lack thereof; and finally that of governmental review and oversight.

1. Membership and eligibility for benefits.

In resolving the question of defendant's right to exclude plaintiff from membership in the Fort Lee relief association[10] there is no need to reach for a strained statutory construction in order to avoid a constitutional issue. The applicable provision is N.J.S.A. 43:17-9. It deals with membership in local relief associations, and its language is simple and unambiguous. Although quoted above, it bears repeating here:
The membership of such corporation (the local relief association) shall consist, without any formal election thereto, of the officers and members of such fire *281 ... companies ... as shall be under the supervision or control of the governing ... body of the municipality....
That language could hardly be clearer: All members of a local fire department  by virtue of that fire department membership, and without any further election  are automatically members of the relief association of that municipality. The language is simply not susceptible to any other reasonable interpretation.
Notwithstanding that unambiguous language, defendant contends that the statute does not in fact mean what its language clearly says; that every member of a municipal fire department shall be a member of the relief association of that municipality. Defendant says that section must be read in connection with its legislative history. The claim is that in 1885 there was a substantial reorganization of existing local relief associations. The present statutory scheme (in substance) was created and called for the re-incorporation of old associations under the new statutory scheme. Defendant says the provision quoted above constitutes a "grandfather" clause by which members of the pre-existing relief associations automatically became members of the new, re-organized relief associations.
The claim must fail for a number of reasons.
First, it is settled that when statutory language is clear and unambiguous on its face, that plain meaning cannot be varied by resort to legislative history:
It is a familiar rule of construction that where phraseology is precise and unambiguous there is no room for judicial interpretation or for resort to extrinsic material. [Vreeland v. Byrne, 72 N.J. 292, 302 (1977)].
See also, State v. Maguire, 84 N.J. 508, 528 (1980); Sheeran v. Nationwide Mutual Ins. Co., Inc., 80 N.J. 548, 556 (1979).
Second, and in any event, the language of N.J.S.A. 43:17-9 is simply not consistent with defendant's argument. The statute does not say that the membership of the local associations shall consist of officers and members of any pre-existing relief association. The reference is to members of fire companies or fire departments  not to pre-existing relief associations. It *282 is members of fire companies who are automatically made members of present relief associations. Certainly if the statute were intended to have the meaning urged by defendant, it would have referred to officers and members of "pre-existing relief associations", not "officers and members of fire companies under the supervision or control of the governing body of the municipality.[11]
Further, even assuming that the statute does have the effect claimed by defendant, there is no reason to give it only that limited effect. The language quite clearly says that all members of a municipal fire department shall be members of the local relief association. If the enactment were given the "grandfather" effect urged by defendant, there would still be no reason to deny it the additional import spelled out by its unambiguous language.
And finally, the conclusion that all members of a local fire department are to be members of the local relief association is supported by the principle discussed above: that a court should strive for a statutory interpretation which will not violate constitutional principles. For if defendant were found to have the discretionary authority to admit or reject fire fighters to local associations, there would be a serious doubt as to the constitutionality of the provision. See, Jordan, 90 N.J. at 434, upholding the challenged statute only because its purpose was to provide for the welfare of all horsemen operating in the state and not just members of the defendant association.
Nor is there any basis for a claim that inability to pass a physical examination devised by defendant constitutes a justification *283 for non-compliance with the provisions of N.J.S.A. 43:17-9.
Although defendant suggests that the exclusion rests in part on safety concerns for plaintiff and his fellow fire fighters, that claim is specious. Plaintiff has not been rejected as a fire fighter. The decision to accept him for that position was made by the municipal governing body, and there is no claim that defendant has any voice in accepting or rejecting an application for membership in a municipal fire department. Plaintiff is presently serving as a fireman and, presumably, will continue to do so. The only difference between him and other fire fighters is that if he becomes injured, or has need of relief benefits, or dies, no benefits will be paid to him or his family, although other members of the department will be eligible for those benefits.
Defendant also attempts to justify its action on the ground of reducing actuarial risks and excessive claims against its fund. That argument also is without merit.
As noted, the decision to accept or reject plaintiff (or anyone else) as a fire fighter is made by the municipal appointing authority. Defendant has no power to participate in, and certainly not to veto, that decision. And once that decision is made, N.J.S.A. 43:17-9 dictates that anyone accepted for the position ipso facto becomes a member of the local and state relief associations. There is no statutory authority to deny membership because of greater actuarial risk. That power would raise potentially serious and delicate issues of possible discrimination based on age, sex or  as here  physical condition. All of those categories have been the subject of extensive legislation designed to protect against invidious discrimination. Absent some affirmative indication that the Legislature intended the State Association to have such power concerning fire fighters there is certainly no reason for a court to imply such a *284 power  particularly in the face of the express language of N.J.S.A. 43:17-9.[12]
The remaining issue concerning membership is the validity of the "quota" system by which defendant has in the past limited association membership when the number of fire fighters in certain municipalities exceeded limits imposed by defendant.[13]
In that regard, it should first be noted that as a condition to the receipt of relief or death benefits defendant has imposed another, quite reasonable, safeguard. It requires that a fire fighter shall have responded to at least 60% of the alarms in his or her municipality over a designated number of years in order to qualify for benefits. Thus, there is no reasonable basis for a fear of someone being a fire fighter in name only and collecting benefits without actually performing services.
There is no justification, however, for imposition of the quota system described above. That system is clearly contrary to N.J.S.A. 43:17-9 and cannot stand. The decision as to how many fire fighters are reasonable or necessary for a given municipality is a decision left to the governing body of that municipality. And once that decision is made within the municipality, *285 and members are appointed to the municipal fire department, those members are  without more  eligible to become members of the local association and the State Association. There is no warrant or justification in the statute, or anywhere else, for defendant unilaterally to impose a numerical quota to limit or bar that membership.[14]

2. The "lack of standards" claim.

Plaintiff's claim that the statutes governing the Firemen's Relief Fund represent an unconstitutional delegation of legislative power without adequate controlling standards, can also be resolved by proper statutory interpretation without reaching constitutional issues. Here too, the difficulty lies not with the statutes themselves, but with defendant's failure to comply with them.
As noted above, plaintiff does not claim that a delegation of legislative authority to a "private" entity[15] is per se unconstitutional. It is clear  and plaintiff acknowledges  that our courts employ a test of "reasonableness" in judging the validity of such a delegation.
Thus, in Male v. Renda Contracting Co., Inc., 64 N.J. 199 (1974) the Court held that a delegation of authority to permit collective bargaining agents to set wages in a particular trade was not unconstitutional. It sustained the grant of authority even though the effect of the statute was to enable

*286 the parties who negotiate the collective bargaining agreements (to) also establish the statutory wage rate for public works in the locality. Although this must be viewed as some form of delegation of legislative power to private parties, such delegation is not per se unconstitutional. The test is whether the particular delegation is reasonable under the circumstances considering the purpose and aim of the statute. [64 N.J. at 201]
See also, to the same effect, Humane Society of the U.S. v. N.J. Fish and Game Council, 70 N.J. 565 (1976). And see, In Re Horst Oertel, 167 N.J. Super. 557, 560 (App.Div. 1979), where the court said there was "no doubt" that the measure before it did
constitute a delegation by a state agency to a private agency. But the fact of delegation alone does not automatically render it unreasonable or otherwise invalid. As our Supreme Court held in ... (Male), the test is "whether the particular delegation is reasonable under the circumstances considering the purpose and aim of the statute".
Plaintiff's claim, of course, is that the delegation of authority here is "unreasonable." And it is unreasonable, he says, because it lacks proper standards to guide and limit the exercise of the delegated power.[16]
In fact, however, there are ample and sufficiently clear standards contained in the statutes creating and regulating the Firemen's Relief Fund. They are contained in those sections which set out the objectives which the Legislature sought to accomplish by adoption of Chapter 17 of Title 43. Those objectives are described in N.J.S.A. 43:17-3. They are,
to establish, provide for and maintain a fund for the relief, support or burial of indigent exempt firemen and their families, and of any persons and the families of any persons who may be injured or killed while doing public fire duty, or may become indigent or be disabled or may die as the result of doing such duty or may be prevented by the injury or by sickness arising from their doing such duty, from attending to their usual occupation or calling. [N.J.S.A. 43:17-3]
*287 And see, to the same effect, N.J.S.A. 43:17-35, which repeats in shortened form the direction that relief association funds are to be used for "the relief, support and maintenance of exempt, paid or volunteer firemen and their dependents."[17]
Those stated objectives provide overall standards sufficient to withstand constitutional attack. They make clear that the persons who are to receive benefits under the relief aspect of the fund are those who are in need, or indigent, whether the need is that of the fire fighter or the fire fighter's family, and particularly if the need is caused by a fire-related injury.[18]
The objectives are not difficult to understand. They do not leave courts, administrators or prospective beneficiaries of the fund without guidance. The standards they incorporate may be broad and general but they are no more broad or general than others which have been upheld by our courts in a variety of cases in a variety of circumstances.
The applicable principle is set out in Worthington v. Fauver, 88 N.J. 183, 208-209 (1982):
The Legislature may delegate its authority as long as it provides standards to guide the discretionary exercise of the delegated power.... Such standards *288 may be general ... as long as they are as precise and revealing as the subject reasonably permits.... We frequently have upheld statutes delegating broad powers in furtherance of the public health, safety and welfare.
One case where the court sustained such a general delegation of authority  with a good deal less specificity than the delegation here  is Burton v. Sills, 53 N.J. 86 (1968). There, in connection with the New Jersey Gun Control Law, N.J.S.A. 2A:151-1 et seq., the Superintendent of the State Police was empowered to prescribe "standards and qualifications" for licensing sellers of firearms. The standard was nothing more precise than "the public safety, health and welfare." The Court upheld the delegation of authority saying that the guideline "though general, is comparable to that set forth in many other State enactments and is, in its context, clearly sufficient." 53 N.J. at 90.
Como Farms, Inc. v. Foran, 6 N.J. Super. 306, 312 (App.Div. 1950) is a similar case which involved a delegation of authority to the Director of the Office of Milk Industry to fix prices and promulgate regulations concerning the sale of milk. The statutory standard which was to guide the Director referred to the need
to control or prevent unfair, unjust destructive or demoralizing practices which are likely to result in the demoralization of agricultural interests in this State engaged in the production of milk or interfere with the maintenance of a fresh, wholesome supply of sanitary milk for the consumers of this State.
Judge (later Justice) Jacobs held the standard constitutionally permissible. He compared it to delegations upheld in other cases, such as a grant of authority to the Board of Public Utility Commissions limited only by "the standard of public convenience and necessity," Fornarotto v. Bd. of Public Utility Commissioners, 105 N.J.L. 28, 32 (Sup.Ct. 1928); a grant to the Commissioner of Alcoholic Beverage Control authorizing fixing of prices and adopting of regulations "in such a manner as to promote temperance and eliminate the racketeer and bootlegger," Gaine v. Burnett, 122 N.J.L. 39 (Sup.Ct. 1939), aff'd, 123 N.J.L. 317 (E. & A. 1939); and to federal cases affirming standards as broad and general as "just and reasonable," *289 Federal Power Comm. v. Hope Natural Gas Co., 320 U.S. 591, 64 S.Ct. 281, 88 L.Ed. 333 (1940), and "unfair methods of competition," Federal Trade Comm. v. Keppel & Bro., 291 U.S. 304, 54 S.Ct. 423, 78 L.Ed. 814 (1934). His conclusion was that the standard before the court "embodies a legally sufficient standard to guide" the Director's exercise of the authority delegated to him. And see, to the same general effect, among many other cases containing similar statements, Mt. Laurel Tp. v. Public Advocate of N.J., 83 N.J. 522, 532 (1980).
Further, except for their reference to fire-related injuries, the standards here are not significantly different from, and are at least as specific as, those set out in any number of comparable statutes dealing with relief or welfare programs. See, e.g., the provisions of the Old Age Assistance Program, set out in N.J.S.A. 44:7-1 et seq., which define those eligible for assistance as
every needy person, sixty-five years of age or upwards, residing in this State.... [N.J.S.A. 44:7-3].
See also, to the same general effect, the General Public Assistance Law, N.J.S.A. 44:8-107 et seq., also applying a criterion of "needy," N.J.S.A. 44:8-109; and the statues dealing with Aid to Families with Dependent Children, N.J.S.A. 44:10-1 et seq., which refer to and incorporate the standards set out in N.J.S.A. 44:7-1 et seq.
In short, the standards set out in the statutes establishing the Firemen's Relief Association are comparable to those which exist and have been sustained in countless other delegations of rule-making authority. They are constitutionally sufficient. What is missing is not specificity in the statutes creating the delegation of authority. Rather, what is missing is the specific regulations which would give content to those standards. And the formulation and adoption of those regulations is a function which the statutes here have assigned to the State Association.
Thus, N.J.S.A. 43:17-35 states that payments from the fund are to be made

*290 in accordance with such reasonable rules and regulations in regard thereto as the executive committee of the New Jersey State Firemen's Association from time to time establishes.
And see to the same effect, N.J.S.A. 43:17-45 which states that the executive committee of the State Association shall have "supervision and power of control of the funds and other property of all firemen's relief associations."
Those statutory provisions are not elective. They are mandatory. They require action by the State Association.
The State Association, however, has not complied with that obligation. It has not adopted a set of regulations governing payments by the local associations. And it is that failure by defendant to fulfill its obligation that has produced what plaintiff correctly claims is a lack of standards to be applied by the local organizations when administering the funds made available to them. Defendant's lengthy set of rules provides no such guidance. And defendant acknowledges that local awards are made or denied on a case-by-case basis, presumably depending upon some instinctive feeling on the part of local boards of trustees.
Clearly, that state of affairs is the antithesis of the reasonable treatment which is a requirement of a constitutionally sound delegation of authority. See cases cited, supra. Were there no other means of curing the defect, a declaration of unconstitutionality would almost certainly be required.
But there is another recourse here: defendant must comply with and perform its statutory obligations. It must enact and enforce reasonable regulations governing local associations in their administration of the funds made available to them. While that task may be not easy, it is far from impossible.
There are many statutory and regulatory programs, federal, state, and local, that deal with relief and welfare programs. Virtually all have adopted regulations, which often include such matters as income levels and asset qualifications, together with a description of incidents or events which will entitle a person *291 to one or more benefits. See, e.g., the statutes dealing with Aid to Families with Dependent Children in N.J.S.A. 44:10-1 et seq. and the regulations pertaining thereto in N.J.A.C. 10:81-1.1 et seq. through N.J.A.C. 10:81-3.1 et seq. See also the statutory provisions concerning child care centers in N.J.S.A. 30:5B-1 et seq., and the supplemented regulations set out in N.J.A.C. 10:122-1.1 et seq. It would seem likely that those regulations could provide some assistance and guidance to defendant in complying with its obligations. And certainly there is no shortgage of expertise, among attorneys, welfare workers, accountants, actuaries and other experts who could be retained by defendant to assist in putting together its required code of regulations.
Once that is done, there will be standards to be applied by officials of local associations. Potential beneficiaries will know what their rights are, what they can expect and whether they are receiving all to which they are entitled. And courts called upon to review the grant or denial of benefits will have a standard against which to measure administrative decisions.[19]
It is of course possible that there may be challenges to particular regulations adopted by defendant. But that is not unusual and there is no reason why judicial review could not be effected as well here as in any other areas where courts are called upon to examine the validity of administrative rule-making.[20]
*292 In sum, the legislative objectives are clearly set out. Those objectives provide the standards  the framework  within which specific regulations must be adopted by the agency charged by statute with that responsibility  the State Association. That task may require substantial effort, but it far from impossible. It is in any event, essential if defendant is to comply with its obligations and if the constitutionality of the statutory program is to be sustained.

3. Accountability for the expenditure of funds.

The third prong of plaintiff's constitutional attack focuses on what he claims is a lack of accountability for the public funds spent by the local and State Associations. As part of that claim he points to the substantial expenditure of funds for convention expenses.[21]
As discussed in point 2 above, the statutes dealing with the Firemen's Relief Fund contain clear directions for the State Association to exercise supervision and control over the local associations. In addition to the provisions already discussed, N.J.S.A. 43:17-31 requires each local association to file annually with the Secretary of State and with the Executive Committee of the State Association a financial report listing its "receipts and expenses during the year, which expenses shall be stated in detail." It also directs that the Executive Committee shall "forthwith make an examination of the statement to determine whether the local association has complied with the requirements of this chapter relating thereto." And N.J.S.A. 43:17-45 provides that the State Association is to confirm that the funds of the local associations are "properly ... expended" and is also *293 to examine the annual reports of each association. That section also requires the Executive Committee to report annually to the Commissioner of Insurance a list of all complying local associations and says that "only associations so reported" are entitled to the funds appropriated from the 2% tax on insurance premiums. See also, N.J.S.A. 43:17-46, which contains additional provisions authorizing the State Association to select an auditor who may examine the books and property of any local association at any time.
Provisions concerning review and supervision by state government officials, however, are less clear. In Jordan v. Horsemen's Benev. & Prot. Ass'n., supra, the Court concluded that such governmental review and supervision was necessary in order for the challenged program to survive a constitutional attack based on an alleged ability to use public money for private purposes. There, the Court read the statute before it as implying an obligation on the part of the State Treasurer and the State Racing Commission to review annual reports filed with them in order to insure that the funds in question were used "to finance benevolent programs and the administrative and overhead costs reasonably related to those programs" and not for private purposes. 90 N.J. at 436. See also, Horsemen's Benev. & Prot. Ass'n. v. Atlantic City Racing Ass'n., 98 N.J. 445, 452-453. (1985).
Again, the pattern in Jordan is remarkably similar to that here. In Jordan, as here, there was no express statutory direction for the state officials to audit the reports submitted to them to insure proper use of public funds. Nevertheless, the court found that the statute before it was "reasonably susceptible to a construction" that would free it from what otherwise would be a constitutional infirmity. It therefore applied that construction and implied into the statute a duty on the part of the state officials to review the reports filed with them.
There is no reason why that same rationale should not apply here. It is reasonable to conclude that "the Legislature would *294 prefer that the statutes survive with appropriate modifications rather than succumb to constitutional infirmities." The language here is as "reasonably susceptible" as was that in Jordan to a construction which will avoid an otherwise fatal constitutional flaw.[22] And both the language and the philosophy of the statutes are consistent with a requirement of sufficient governmental oversight to insure that public funds are used properly, for public purposes and not for private ends.
Thus, it is this court's conclusion that the state agencies with whom the aforesaid reports are filed  the office of the Secretary of State and the Department of Insurance  have an obligation to review and audit those reports to insure that public monies are properly expended.[23] As part of that review and audit they must determine whether there are excessive expenditures for such items as the annual convention so that those expenditures represent payments for private rather than public purposes, or whether those expenditures simply constitute "administrative and overhead costs reasonably related to" the benevolent programs conducted by the State and local associations. See Jordan, 90 N.J. at 436.
The allocation of that responsibility between the two state agencies referred to will not be dealt with at this time. Whatever suggestions may be forthcoming from those agencies, and from the Attorney General, will be considered in framing an *295 appropriate judgment in this action, or perhaps in supplemental orders which may follow entry of judgment.[24]
Nor is it appropriate at this time to attempt any more specific delineation of what may be considered reasonable or unreasonable, or lawful or unlawful expenses. As noted, plaintiff's challenge here is to the constitutionality of the statute on its face. In that regard, however, see Horsemen's Benev. & Prot. Ass'n. v. Atlantic City Racing Ass'n., 98 N.J. at 453, where, in commenting on state oversight of expenditures by the Association, the court noted that
We venture to suggest ... that it is appropriate, if not critical, for the New Jersey Racing Commission to adopt regulations governing NJHBPA expenditures. .. . Regulatory guidelines would serve an important function for interested parties (and) ... would also facilitate judicial review of any administrative decision and ensure that the agency is fulfilling the legislative mandate.
In sum, the statute being challenged is subject to a reasonable and rational interpretation which obviates the challenge levied by plaintiff based on what he claims is a lack of official oversight of the use of these public funds. There is no reason why that interpretation should not be adopted and there is every reason to exert this reasonable effort to preserve a statutory program which was established by the Legislature as far back as 1885 and which has been in effect since that time. Under this construction that program may continue, but it will continue with constitutionally mandated safeguards.

CONCLUSION
In view of the conclusions set out above, the constitutional challenge to the statutes governing the Firemen's Relief Fund *296 is rejected. Defendant's determination that plaintiff is ineligible for membership in or benefits from the Fort Lee and State Relief Association, is set aside. Defendant shall be directed to comply with its statutory obligations to adopt regulations governing operation of the relief program which it has heretofore left to the various local relief associations. And the reports required by statute to be submitted to the Commissioner of Insurance and the Secretary of State shall be submitted to those officials for the purpose of their being audited and reviewed by the appropriate state official.
Counsel for plaintiff is requested to submit what he considers an appropriate form of judgment, and distribute a copy of same to counsel for the defendant and the Attorney General. A further hearing will then be held to fix the final form of judgment.
NOTES
[1] Art. 8, Sec. 3, Par. 3, of the New Jersey Constitution provides:

No donation of land or appropriation of money shall be made by the State or any county or municipal corporation to or for the use of any society, association or corporation whatever.
[2] N.J.S.A. 43:17-1, and most of the other applicable statutes, refer to "fire engine, hook and ladder, hose or supply companies" as being fire companies whose members can associate themselves into a relief association. The statutes also include associations of "exempt firemen" who are, essentially, treated the same as active fire companies. Since the status of exempt firemen has no significance in this case, provisions respecting exempt firemen in the other statutory sections cited will not be specifically referred to. Similarly, since the statutes make no distinction between the different kinds of fire companies, the reference hereinafter will be to the generic term "fire company."
[3] The original 1885 statute gave this rule making authority to the board of representatives of each local association. That statute is still in existence as N.J.S.A. 43:17-24. N.J.S.A. 43:17-35, which places the rule making authority in the executive committee of the State Association was adopted in 1922, but section 24 was not repealed at that time. Defendant construes section 35 as taking precedence, with section 24 being, essentially, a dead letter as concerns rule making authority. Plaintiff does not challenge that conclusion. It is the most reasonable resolution of the apparent inconsistency and is accepted by this court as well.
[4] N.J.S.A. 43:17-29 provides for the local association to pay the convention expenses of its delegates. The convention is held annually in Wildwood. Convention expenses are substantial and, in a number of municipalities convention expenses exceed the sum paid out in benefits to fire fighters and their families.
[5] The Firemen's Home is a separate entity governed and operated pursuant to N.J.S.A. 30:7-1 et seq. The only formal connection between the home and the State Association is that the president of the State Association is ex officio a member of the board of managers of the home.
[6] For a fire fighter killed in the line of duty the death benefit is $6,400.
[7] There are a few limitations set out in the Rules. Claims for cosmetic, dental or elective surgery are not allowed, nor are medical bills covered by insurance, plus a $100 deductible amount. The maximum that a local association can pay on any claim is fixed by the State Association, depending on the assets of the local. There is also an overall limit of $1,500 for any claim, although a member can apply to the State Association for a "supplemental" grant in an "appropriate case." There is no definition of an "appropriate case," and no indication of when a supplemental grant will be made, or the amount thereof.
[8] There is at least some element of unchanneled discretion in the State Association's administration of the death benefit program as well. Article VII, section 2 of the Rules says that the death benefit shall be paid, in order of priority, to the decedent's widow or widower, to his or her children, or to the decedent's parents. It then provides that if there is no surviving spouse, child or parent, the local association shall determine "if the claim should be allowed and if so, to whom the funds should be disbursed". No standard is set for application of that discretion. (Art. VII, Sec. 4)
[9] This court is satisfied that payment of relief and/or death benefits to municipal firefighters clearly meets the public purpose requirement. Provisions for fire fighting services are often an analgam of private and governmental efforts. See, e.g., N.J.S.A. 40A:14-34, authorizing a municipality to appropriate public funds for the use of a volunteer fire company; N.J.S.A. 40A:14-36, authorizing a municipality to compensate a volunteer fire fighter for losses sustained while on fire duty; and N.J.S.A. 40A:14-37, validating the use of public funds to purchase group life insurance for members of a volunteer fire department. Provisions such as these have been upheld on the basis that fire protection constitutes a public purpose and that a private organization engaged in fire protection is furthering that public purpose. See, e.g., Schwartz v. Borough of Stockton, 32 N.J. 141 (1960); Tp. of Willingboro v. Mobil Oil Corp., 159 N.J. Super. 593 (App.Div. 1978); D'Eustachio v. Beverly, 177 N.J. Super. 566, 572 (Law Div. 1979). As noted, plaintiff does not dispute, and impliedly concedes, the point.
[10] Neither the State Association nor the local Fort Lee Association has always made a clear distinction between membership in the local association as distinct from the state organization. Thus, when plaintiff's membership application was denied, the letter from the local association advising him of that action was headed "application for membership in the New Jersey State Firemen's Association." The body of the letter, however, together with an enclosed letter from the State Association, simply referred to plaintiff's "application for membership." The statutes actually refer to membership only in the local association, with that membership being the basis of eligibility for benefits provided by both the local and the State Associations. The position of the State Association is that its rule making power under N.J.S.A. 43:17-35 gives it the authority to establish criteria for local association membership.
[11] The contrast between N.J.S.A. 43:17-9 and 43:17-8 is significant in this regard. The latter deals with a turn-over of assets, etc. of any pre-existing relief association to any new entity created under the statute. There the legislature quite clearly referred to "any money, accounts payable, property and securities ... (of the) old association or corporation" being paid over "to the new corporation." The language of N.J.S.A. 43:17-9 is markedly different.
[12] Plaintiff does in fact claim that defendant's denying him benefits under the Firemen's Relief Fund because of his physical handicap violates the New Jersey Law Against Discrimination, N.J.S.A. 10:5-4 and 10:5-4.1. See also, N.J.A.C. 13:12-1.1(a). Since the Law Against Discrimination prohibits differential treatment because of a "physical handicap," plaintiff's claim would seem to have merit. The defense that the nature of the handicap "reasonably precludes the performance of the particular employment" would not seem available to defendant since the appointing authority  the municipality  clearly found that plaintiff was capable of performing the duties of a volunteer fireman. In view of the conclusion set out above  that defendant may not deny those benefits to plaintiff  the discrimination issue need not be ruled on here.
[13] Although the quota system is not being used at present, it still exists in defendant's constitution and by-laws and could be re-imposed at anytime defendant thinks it appropriate to do so. Thus it is still a "live" issue. It has been briefed and argued and there is no reason why it should not be decided at this time.
[14] Defendant's rules also provide for a sliding scale of death benefits depending upon the number of years of service before death. That is different from the quota just discussed, which had the effect of requiring fire fighters in one municipality to wait longer than those in another before being eligible for benefits. Plaintiff does not challenge the sliding scale of increasing benefits and that aspect of defendant's rules seems reasonable.
[15] Plaintiff claims the State Association is a "private" rather than a public body. Defendant disputes that characterization. In view of this court's decision on the merits of the case, the selection of one characterization over the other is not critical. Plaintiff's description, however, certainly seems more accurate than defendant's.
[16] Cases invalidating a grant of legislative authority to a private entity because it is "unreasonable" frequently do so either because the delegation lacks proper standards [N.J.Dept. of Transportation v. Brzoska, 139 N.J. Super. 510 (App.Div. 1976)] or because it involves a conflict of interest [Group Health Ins. of N.J. v. Howell, 40 N.J. 436 (1963)]. The conflict of interest charge has not been raised and is not involved here.
[17] Reference to such statements of purpose or similar collateral sources to find "standards" to limit a delegation of authority is both appropriate and customary. For example, in Ward v. Scott, 11 N.J. 117, 123 (1952) the Court found standards to guide boards of adjustment in granting "use variances" by referring to a separate statutory section listing the purposes for which a municipality could adopt zoning ordinances. It saw no reason not to apply those standards:

In dealing with questions of standards it is elementary that we are not confined to the specific words of (a) subsection ... but must examine the entire act in the light of its surroundings and objectives.... Nor are we restricted to the ascertainment of standards in express terms if they may be reasonably implied from the entire act.
See also, to the same effect, Schierstead v. City of Brigantine, 20 N.J. 164, 169 (1955).
[18] Subject to the one exception referred to in footnote 8, the State Association has operated the death benefit fund (as opposed to the relief fund) without regard to need. Plaintiff does not challenge that policy and this court expresses no opinion on the propriety of that practice.
[19] The Rules to be adopted should of course, eliminate the in terrorem clauses quoted above. They are indefensible, and indeed defendant makes no attempt to defend them.
[20] During argument the court inquired whether the State Association might be subject to the Administrative Procedure Act, N.J.S.A. 52:14B-1, et seq., which regulates the method of adopting and publicizing rules of state agencies. Both parties say the Act does not cover defendant and, in answer to another question from the court, both agree that there is no avenue for a voluntary compliance with the provisions of the Act, which could include, e.g., publication in the New Jersey Administrative Code. The Office of Administrative Procedures concurs in that conclusion. Given the magnitude of the funds administered by the state and local associations, the question might be worthy of attention by the Legislature.
[21] Plaintiff's claim is that the statutory program is unconstitutional on its face. Thus, this suit is not a vehicle for testing the appropriateness of specific expenditures. Rather, the question is whether the statute, on its face, provides for or permits those public funds to be used for private purposes.
[22] The statutory language in Jordan provided that the reports to be filed with the Treasurer and the Racing Commission "shall be subject to review by them." The statutory language here does not use the words "subject to review" but other than that the two formulations are essentially the same. Since it could hardly be argued (and defendant does not argue) that a report filed with the commissioner of insurance to demonstrate compliance with statutory requirements is not "subject to review" by him, the difference is not material.
[23] Defendant does not express disagreement with this conclusion. It says it does not know "whether and to what extent those reports and statements are formally audited or reviewed by the state agencies involved. Generally, where there is a duty to file there is a duty to audit."
[24] Neither the Commissioner of Insurance nor the Secretary of State is a party to this action. The Attorney General was given notice of the proceeding when the complaint was filed, but declined to participate. The Attorney General is not a necessary party although, pursuant to R. 4:28-4(a) he must be notified of any action challenging the constitutionality of a statute. In view of the conclusions reached herein, the court will request the Attorney General's participation in further proceedings.